759 P.2d 1012

**Herbert C. LEWIS, Plaintiff–Appellee,**

v.

**Abe RODRIGUEZ, d/b/a Abe Rodriguez & Associates, Defendant–Appellant.**

**No. 8996.**

Court of Appeals of New Mexico.

July 5, 1988.

Ernesto J. Romero, David C. Hughes, Albuquerque, for plaintiff-appellee.

Scott McCarty, Joseph William Reichert, Albuquerque, for defendant-appellant.

## OPINION

APODACA, Judge.

Defendant Abe Rodriguez (Rodriguez) appeals from a judgment for plaintiff Herbert C. Lewis (Lewis) after a jury verdict. Lewis filed suit against Rodriguez for negligent administration of a polygraph examination, alleging professional malpractice. Two issues are raised on appeal: (1) whether the trial court erred in instructing the jury under a malpractice theory of negligence, as opposed to a simple negligence theory; and (2) whether the trial court erred in failing to instruct the jury on what is commonly referred to as the "locality rule," under which a professional person is bound to the standard of care established by other like professionals practicing *under similar circumstances*, giving due consideration to the *locality involved.* Implicit in Issue (1) is the sub-issue of whether a polygraph examiner is a professional.

With respect to Issue (1), we conclude that Rodriguez was a professional and that the instruction given was thus proper. With respect to Issue (2), we hold that Rodriguez failed to preserve the claimed error in the trial court and the issue is therefore not properly before us. We thus affirm the trial court's judgment.

Lewis was employed as a corrections officer at the Bernalillo County Detention Center. Confidential informants, who were residents of the jail, made statements alleging that Lewis was bringing drugs into the detention center. Because of these allegations, Lewis was required by his employer to submit to a polygraph examination given by Rodriguez.

At trial, Lewis testified that: (1) if he refused to submit to the examination, he would be terminated from employment; (2) just before the examination, Rodriguez became obnoxious and belligerent, yelled at him, and used obscenities; and (3) as a result of Rodriguez' abusive treatment, Lewis was angry and upset during administration of the test. Lewis also presented testimony from several polygraph examiners who testified regarding the procedures generally followed in administering and scoring an examination. Lewis was terminated from his employment based on the results of the polygraph examination administered and scored by Rodriguez. At trial, Lewis submitted an instruction modeled after the uniform jury instruction for medical malpractice, NMSA 1978, UJI Civ. 11.1 (Repl.Pamp.1980) (now codified as SCRA 1986, 13–1101), and setting out the malpractice standard of care. In opposition, Rodriguez argued that the jury should be instructed under a simple negligence standard, and he submitted a negligence instruction modeled after NMSA 1978, UJI Civ. 3.2 (Repl.Pamp.1980) (now codified as SCRA 1986, 13–302A–13–302F). Concluding that a polygraph examiner is a professional, the trial court instructed the jury under the malpractice standard.

*Discussion*

Issue (1)

■ Rodriguez first contends he was only required to adhere to a "reasonable man" standard of care. He cites no authority to support this contention. *See In re Adoption of Doe*, 100 N.M. 764, 676 P.2d 1329 (1984). On the other hand, Lewis argues that polygraphers are professionals and therefore subject to a malpractice standard. He encourages this court to hold, as a matter of law, that polygraphers are professional persons, and thus subject to a malpractice standard. *See Garcia v. Color Tile Distrib. Co.*, 75 N.M. 570, 408 P.2d 145 (1965) (degree of care necessarily required by one who undertakes to render services to another in practice of trade that is result of acquired learning, or developed through special training and experience, is that which a reasonably prudent person skilled in such work would exercise).

In support of his contention, Lewis relies on the following: (1) Rodriguez testified that he regarded himself as a professional and that his professionalism had never been questioned; (2) SCRA 1986, 11–707 indicates the supreme court's recognition that professional polygraphers should be permitted to render their opinions in court when certain standards are met; (3) Rodriguez has complied with these standards, since he has testified in court on several occasions; (4) Rodriguez has been a licensed polygrapher since 1971 or 1972 and was chairman of the New Mexico Board of Polygraph Examiners during the 1970s; (5) polygraphy has progressed in recent years as a true profession; and (6) since Rodriguez clearly regards himself as a professional polygrapher, he should be subject to the same standards as other professional persons.

Lewis cites two cases that recognize a cause of action for negligent administration of a polygraph examination. *See Lawson v. Howmet Aluminum Corp.*, 449 N.E.2d 1172 (Ind.App.1983) and *Zampatori v. United Parcel Serv.*, 125 Misc.2d 405, 479 N.Y.S.2d 470 (1984). Neither of these cases specifically addresses the duty of care owed by the polygraph examiner to the examinee. In *Lawson, supra,* the Indiana Court of Appeals determined that the plaintiff-examinee was entitled to require that the defendant-examiner exercise reasonable care in administering the test fairly and impartially. The court reversed summary judgment in favor of defendant on this issue. In *Zampatori,* the New York Supreme Court also denied defendant-examiner's motion for summary judgment on the ground that the examiner had a duty of good faith and reasonable care in administering a polygraph to an examinee, and further, that the examiner could reasonably foresee that the negligent administration of a polygraph could result in damages for the employee-examinee. These two cases, however, do not directly discuss whether the polygraph examiner has the legal duty of a reasonably prudent person or the duty and care of a reasonably well-qualified polygraph examiner under similar circumstances. In essence, as the reviewing court in this case of first impression, we have been asked to determine the appropriate standard in this jurisdiction. To address this question, we must first decide whether a polygraph examiner is a "professional" and therefore subject to certain professional standards.

The factors used in determining whether certain individuals are "professionals" under the National Labor Relations Act (NLRA) and the Fair Labor Standards Act (FLSA), may be helpful to us as examples of those duties performed by individuals generally considered to be professional persons.

The definition of a "professional employee" under the NLRA is aptly stated in the following summary:

> For an employee to qualify as a "professional employee" under the National Labor Relations Act, his occupation must meet all four of the requirements outlined in 29 USCS § 152(12). The work must be predominantly intellectual and nonroutine * * * involving the consistent exercise of discretion and judgment * * * and must not be standardized in terms of time. * * * The position also must require knowledge customarily ac-

quired by specialized study in an institution of higher learning.

Annotation, *Who are Professional Employees Within Meaning of National Labor Relations Act* (29 USCS § 152(12)), 40 A.L.R.Fed. 25, 35 (1978). Whether the employee is licensed by the state is persuasive as evidence of the employee's professional status, but such licensure is not deemed conclusive. *Id.* Also, with whom an employee works is significant; the fact that an employee works with professionals, for example, may qualify him as a professional. *Id.* Whether the employee is fully using his training is another factor to consider. *Id.*

Under the FLSA, an employee is deemed employed in a bona fide "professional" capacity if his primary duty:

[C]onsists of work requiring knowledge of an advanced type, in a field of science or learning, customarily acquired through a prolonged course of specialized intellectual instruction and study; or work that is original and creative in a recognized field of artistic endeavor; or the practice of law, medicine, or teaching; and whose work requires the consistent exercise of discretion and judgment * * * and is predominantly intellectual and varied in character * * * as opposed to routine mental, manual, mechanical, or physical work. The professional employee's work is of such a character that the output produced, or the result accomplished, cannot be standardized in relation to a given period of time * * *.

Annotation, *Who is Employed in "Professional Capacity," Within Exemption, Under 29 USCS § 213(a)(1), from Minimum Wage and Maximum Hours Provisions of Fair Labor Standards Act*, 77 A.L.R.Fed. 681, 688 (1986). We note that the factors considered under both the NLRA and the FLSA criteria are quite similar. Although the reasons for classifying employees as "professionals" under the NLRA and the FLSA are different from those in the present case, they nonetheless lend some guidance to us in our determination.

We likewise deem pertinent to our inquiry Rodriguez' testimony regarding the procedures a polygrapher follows when conducting a polygraph examination. He testified as follows: after being contacted by the party requesting that an examination be given, the polygrapher meets with that person to determine whether the issue is one that can be addressed by the examination. If so, he next acquaints himself with the relevant facts surrounding the issue. He then meets with the examinee and conducts a physical-psychological interview to ascertain the suitability of the person for examination. The examiner formulates a series of inquiries that include "relevant" and "control" questions. The relevant question is "going to be your most important question; basically, that is the question that addresses the issue. It is the question that is supposed to be well-worded, to the point and does not contain any rationale." *See* SCRA 1986, 11–707(A)(4). He then attempts to put the examinee at ease and goes over the sequence of questions with him. After connecting the polygraph machine to the examinee, he questions the examinee; the machine records the responses. The polygrapher measures and compares the responses and assigns a score to each response. Based on this scoring process, he finally determines whether the examinee was deceptive on particular questions.

Larry Galbreth, who has practiced polygraphy in New Mexico for about fourteen years, testified that the average polygraph school requires approximately three months of training. He also explained the scoring procedures generally followed by polygraphers.

Under NMSA 1978, Section 61–26–2 (Repl.Pamp.1983), "polygraphy" is defined as follows:

[T]he employment of any instrument designed to graphically record simultaneously the physiological changes in human respiration, cardiovascular activity, galvanic skin resistance or reflex for the purpose of lie detection and *includes the reading and interpretation of polygraphic records and results*. (Emphasis added.)

Polygraphers are licensed by the state. The qualifications for licensure are set out in NMSA 1978, Section 61–26–7 (Repl. Pamp.1983), which states in part:

To be eligible for licensure as a polygrapher, a person shall:

    \*    \*    \*    \*    \*    \*

C. \* \* \* either:

(1) successfully pass an examination or another test of the ability to practice polygraphy as prescribed by regulation; or

(2) submit proof of holding, for at least two years immediately prior to the date of application, a current license to practice polygraphy in another jurisdiction whose standards equal or surpass those of New Mexico.

Based on the factors set out above, it becomes readily apparent that the work performed by a polygrapher is consistent with the type of work generally considered to be that of a professional. A polygrapher exercises judgment and discretion in: (1) deciding whether the issue sought to be resolved is one that can be addressed by a polygraph examination; (2) determining the suitability of the examinee for an examination; (3) formulating the series of questions; (4) reading and interpreting polygraphic records and responses; (5) determining what scores to assign the various responses; and (6) arriving at a conclusion, based on the scores, of whether the examinee is being truthful or deceptive. It is thus clear that the primary duties of a polygrapher require a consistent exercise of discretion. These duties are predominantly intellectual and varied in character because the polygrapher is faced with a different issue and a different examinee each time he administers a polygraph examination.

The questions a polygrapher formulates, and the responses recorded, are different for each examinee, and he must exercise discretion when he reads, interprets, and scores the responses. The output produced is of such a character that it cannot be standardized, since each examination is unique. A polygrapher attends a course of specialized intellectual instruction and study, since most polygraphers attend a polygraphy school. Although the study at the polygraphy school is not prolonged (approximately three months), trial testimony revealed that polygraphers often do an internship, during which they are supervised by a more experienced polygrapher. They also attend workshops or continuing education seminars. Finally, as we noted earlier, licensure is required by the state.

In light of our discussion, we hold that polygraphers are professionals subject to a malpractice standard of care. It makes sense to require expert testimony to prove negligent administration of a polygraph examination because the procedures followed in giving such examination are not common knowledge to the average juror. The need for expert testimony under the facts of this case is consistent with our holding that polygraph examiners are professionals. We conclude that the trial court properly instructed the jury under a malpractice theory of negligence.

Issue (2)

Rodriguez next contends that, even if he is held to be a professional subject to a malpractice standard of care, the trial court erred in failing to instruct the jury regarding the "locality rule." He cites to the medical malpractice instruction, UJI Civ. 11.1, and the applicable use note. He relies on the use note for the proposition that in instructing jurors on a malpractice standard of care, the instruction must also inform them that the professional person is bound to the standard of care established by other like professionals practicing under similar circumstances, giving due consideration to the locality involved.

Yet, Rodriguez did not submit an instruction containing the "locality rule," nor did he argue before the trial court that Lewis' proposed instruction was incorrect and should be modified to include the rule. The transcript of proceedings reflects that after the trial court ruled malpractice was the applicable theory of negligence, it encouraged both parties to prepare a complete set of instructions based on this ruling. The transcript indicates Rodriguez' attorney understood he could submit additional instructions that conformed to the trial court's ruling.

Prior to submitting the case to the jury, the trial court and the parties' trial counsel discussed the proposed instructions. Rodriguez' attorney objected to the use of the malpractice instruction and to the modification of it to include part of Rodriguez' requested instruction on negligence and part of Lewis' requested instruction on malpractice. However, Rodriguez did not alert the trial court to the absence of a reference to the "locality rule." In order to preserve error to a given instruction, he was required either to tender a correct instruction and alert the trial court to the fact that the tendered instruction corrected the defect complained of, or point out the specific vice in the instruction given by proper objection. *See Budagher v. Amrep Corp.*, 97 N.M. 116, 637 P.2d 547 (1981). Rodriguez failed to preserve this issue, since he did not tender an instruction containing the "locality rule" nor object to the instruction given on the ground that it did not alert the jury to the rule. We conclude this issue was not preserved in the trial court and is consequently not properly before us for review. *See* SCRA 1986, 12-216.

We affirm the trial court's judgment.

IT IS SO ORDERED.

ALARID and GARCIA, JJ., concur.