**SMITHKLINE BEECHAM CORPORATION and Smithkline Beecham Clinical Laboratories, Inc., Petitioners,**

v.

**Jane DOE, Respondent.**

No. D–4131.

Supreme Court of Texas.

Argued March 8, 1994.
Decided July 21, 1995.

Elizabeth M. Fraley, R. Scott Fraley, Dallas, for petitioners.

Philip Durst, Austin, for respondent.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, CORNYN, ENOCH and OWEN, Justices, joined.

Increasingly within the past decade, the policy of employers in this country has been to screen employees and prospective employees for drug usage. Employers frequently retain independent laboratories to perform drug screening tests. This case requires us to begin to define these laboratories' legal responsibility to persons tested.

Plaintiff's pre-employment drug test revealed the presence of opiates in her urine, and as a result her job offer was withdrawn. Her complaint is not that the test was performed improperly or that the result was incorrect, but that the result was due to her having eaten poppy seeds and not to any use of drugs. Plaintiff contends that the testing laboratory should have informed her and her prospective employer that eating poppy seeds could cause a positive test result. Thus, the principal issue we must decide is whether an independent drug testing laboratory hired by an employer to test prospective employees for drugs owes a person tested a duty to tell that person or the employer that ingestion of certain substances will cause a positive test result. We hold that this duty does not exist.

Plaintiff also alleges that the drug testing laboratory breached other duties to her and intentionally interfered with her offer of prospective employment. We conclude that the laboratory has breached no duty to plaintiff, but that there is a factual dispute regarding her tortious interference claim.

I

Plaintiff, who refers to herself in this litigation by the pseudonym Jane Doe, suffered an adverse summary judgment in the trial court. We therefore review the record in the light most favorable to her, and in that light, the facts are as follows.

Doe, a 24–year–old graduate student studying for a master's degree in business administration, was offered employment by The Quaker Oats Company as a marketing assistant. In accordance with company policy, one of the conditions on Quaker's written offer was Doe's satisfactory completion of a drug screening examination. Quaker's policy stated: "Any individual whose test results are positive and who did not disclose current medications will not be eligible for hire."

Quaker contracted with SmithKline Beecham Clinical Laboratories, Inc. to perform its drug testing. SBCL assured Quaker that its test results were accurate, and Quaker relied upon these assurances. SBCL gave Quaker copies of its promotional materials, but Quaker did not keep them, and so the record does not reflect which of these materials Quaker either did or did not see. At one time SBCL's advertising brochure contained the following statement:

Although most laboratories can offer some form of drug testing at what seems like a good price, the hallmark of a responsible, quality-conscious laboratory is its ability to

offer a *complete testing system*, a system that focuses not only on the assays themselves, but on each transaction in the drug-testing process. [SBCL] has designed a comprehensive drug-testing system that extends from specimen pickup by our own specially trained couriers through proper reporting of results and long-term retention of test records. What this simply means is that a positive result from [SBCL] can be accepted with *virtual certainty* as evidence of drug use.

Contrary to an assertion in the court of appeals' opinion, 855 S.W.2d 248, 256, there is no evidence that Quaker ever saw this statement, but as we have said, neither is there evidence that Quaker did not see the statement. SBCL's advertising materials no longer contain the quoted passage but do state: "A confirmed positive result offers virtually 100 percent assurance that the specified drug is actually present in the urine specimen." SBCL later revised its promotional materials to state:

> In addition, certain types of poppy seeds, if consumed in sufficient quantity, can produce a positive result for opiates. Since the drug contained in these seeds (in minute quantity) is related to the opiates used by drug offenders, there is no way to completely eliminate this potential problem.

Quaker directed Doe to a health center where a urine specimen was taken. There Doe completed a medical history form on which she was to list all medications recently used. The only item Doe listed on the form was birth control pills for which she had a prescription. Doe was not asked what foods she had eaten. The health center sent Doe's urine sample to SBCL for testing. The test revealed the presence of opiates in Doe's urine. SBCL reported this result to Quaker.

When Quaker advised Doe that her drug test was positive, Doe denied using illicit drugs and attempted to attribute the test result to having taken Vicodin, a pain medicine prescribed for her roommate. Since Doe had not listed Vicodin on her medical history form, and since by her own admission she had taken a prescription drug for which she did not have a prescription, Quaker did not accept Doe's explanation. Doe later confessed to Quaker that she had not taken Vicodin and that she had lied because she was, in her words, "under extreme duress" and "completely, essentially out of my mind."

Meanwhile, Doe learned through her own research that eating poppy seeds can cause a drug test result positive for opiates. Doe informed Quaker of this and said that in the days before the test she had eaten several poppy seed muffins which must have caused her positive test result. Quaker nevertheless withdrew Doe's offer of employment in accordance with its policy and advised her that her only recourse was to reapply for a position after six months. When Doe reapplied, Quaker refused to hire her on the grounds that she had not told the truth about taking Vicodin.

Doe asked Quaker to have SBCL return her urine specimen, and Quaker complied, but SBCL was unable to locate it, although according to SBCL's contract with Quaker it should have been preserved. Nevertheless, Doe now concedes that the test was properly performed and the result was accurate—that is, opiates were found in her urine at the levels shown in the report.

We assume for present purposes that Doe's positive test result was due not to any use of drugs but to her ingestion of poppy seeds, which she would not have eaten had she known of their effect on the test. There is no dispute that a person's ingestion of poppy seeds in sufficient quantities will result in the presence of morphine and codeine in his or her urine for a few hours, as established by the several authorities referenced in the margin.[1] SBCL was aware of this and

---

1. Bjerver et al., *Morphine Intake From Poppy Seed Food*, 34 J. PHARMACY PHARMACOLOGY 799 (1982) (eating one to two helpings of poppy seed cake a few hours before a urine test can cause a positive finding of morphine); Elsohly et al., *Poppy Seed Ingestion and Opiates Urinalysis: A Closer Look*, 14 J. ANALYTICAL TOXICOLOGY 308 (1990) (eating one to three poppy seed rolls caused positive drug test result in less than 25% of cases three to eight hours after ingestion, and in no cases 24 hours after ingestion); Fritschi & Prescott, *Morphine Levels in Urine Subsequent to Poppy Seed Consumption*, 27 FORENSIC SCI. INT'L 111, 116 (1985) (urinary morphine levels of up to

knew that its test could not distinguish between poppy seed ingestion and drug use. SBCL did not convey this information to Quaker or Doe. SBCL and Doe never communicated with each other before her test results were reported to Quaker. Quaker would have considered the information important and might have investigated Doe's result more fully if it had known, but its ultimate decision to withdraw Doe's offer consistent with its policy might have been the same. Of the more than 4,000 persons Quaker has had screened for drugs, none besides Doe has ever claimed a positive result due to ingestion of poppy seeds.

Doe sued SBCL and its parent, SmithKline Beecham Corp. (together, SmithKline), for negligence, breach of the duty of good faith and fair dealing, defamation, and tortious interference with a prospective contract. Doe also sued the health clinic, which was later dismissed from the case, and Quaker. The trial court granted summary judgment for SmithKline and Quaker. The court of appeals affirmed the summary judgment for Quaker but reversed the summary judgment for SmithKline on Doe's negligence and tortious interference claims. 855 S.W.2d at 248. SmithKline applied to this Court for writ of error, and Doe filed an application conditioned on SmithKline's application being granted. We granted both applications. 37 Tex.Sup.Ct.J. 427 (Feb. 2, 1994).

SmithKline complains of the reversal of its summary judgment on Doe's claims of negligence and tortious interference. Doe complains of the affirmance of the summary judgments for Quaker and SmithKline. While the case has been pending in this Court, Doe and Quaker have settled. Doe has also withdrawn her point of error complaining of summary judgment for Smith-Kline on her defamation claim. As a result, the only issues which remain are whether SmithKline was entitled to summary judgment on Doe's claims for negligence, tortious interference, and breach of the duty of good faith and fair dealing. We address each in turn.

## II

Doe's pleadings contain the following allegations of negligence against SmithKline:

Defendants ... were negligent, grossly negligent, and/or deliberately indifferent to the rights of plaintiff, in, at least, the following ways:

1. Failing to inform plaintiff before she undertook the urinalysis drug test that poppy seeds are a known cause of positive test results and could lead to her failing the drug test.

2. Failing to inform prospective employers and/or test recipients that poppy seeds are a known cause of positive test results and could lead to a positive test result for opiate use.

3. Failing to instruct plaintiff that, because poppy seeds can alter a drug test result, to abstain from eating poppy seeds or disclose this fact to any defendant.

4. Failing to inquire about whether the plaintiff ingested any poppy seed foods within a reasonable period before her urinalysis test was administered as poppy seeds are a known cause of positive test results.

5. Failing to report the level of opiates found in plaintiff's urine test and failing to inform third persons, including plaintiff's prospective employer, that this lev-

5 ug/ml due solely to consumption of three helpings of poppy seed cake are realistically possible); Hayes et al., *Concentrations of Morphine and Codeine in Serum and Urine after Ingestion of Poppy Seeds*, 33 CLINICAL CHEMISTRY 806 (1987) (eating one or two servings of poppy seed cake can cause a positive result for urinary opiate of several days' duration); Mule & Casella, *Rendering the "Poppy–Seed Defense" Defenseless: Identification of 6–Monoacetylmorphine in Urine by Gas Chromatography/Mass Spectroscopy*, 34 CLINICAL CHEMISTRY 1427 (1988) ("poppy seed defense" to opiate-positive urine in standard drug test can be disproved using another simple test); Pettitt et al., *Opiates in Poppy Seed: Effect on Urinalysis Results after Consumption of Poppy Seed Cake–Filling*, 33 CLINICAL CHEMISTRY 1251 (1987) (consumption of one-fifth of amount of poppy seed filling used to make one cake can produce significant opiate concentrations in urine); Struempler, *Excretion of Morphine in Urine Following the Ingestion of Poppy Seeds*, 153 MIL.MED. 468 (1988) (positive results for urinary morphine in 19 out of 66 naval recruits attributable to eating roast beef sandwiches served on poppy seed buns).

el was consistent with poppy seed ingestion and not illicit drug use.

6. Failing to conduct a review of plaintiff's drug test results to inquire, detect, and determine if plaintiff's positive result was consistent with the ingestion of poppy seeds.

7. Failing to return the plaintiff's drug sample after the test was performed.

Restated, Doe's principal complaint is that SmithKline should have warned her or Quaker, either through dissemination of information, specific instruction or inquiry, how eating poppy seeds might affect a person's drug test. Doe also complains that in reporting her test result SmithKline should have recognized and attempted to determine the effect that eating poppy seeds might have had, and that SmithKline should have returned her urine specimen to her.

■ The existence of a legal duty is, of course, a question of law. *Centeq Realty v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995); *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) (quoting *Abalos v. Oil Dev. Co.,* 544 S.W.2d 627, 631 (Tex.1976)). In determining whether a legal duty exists we take into account not only the law and policies of this State, but the law of other states and the United States, and the views of respected and authoritative restatements and commentators. The court of appeals did not define what duty SmithKline owed Doe. It held only "that SmithKline has failed to conclusively demonstrate that it owed no duty to Doe." 855 S.W.2d at 256. The appeals court also suggested that SmithKline may be liable for affirmatively misrepresenting the significance of test results to Quaker. *Id.* Thus, we consider: first, whether SmithKline had a duty to Doe to warn her or Quaker; second, whether Doe has properly asserted that SmithKline had a duty to her not to misrepresent information to Quaker; and third, whether SmithKline had any other duty to Doe as she alleges. We emphasize that we do not consider what duty SmithKline may owe Quaker, or what duty Quaker may in turn owe Doe. We focus exclusively on the relationship between the laboratory and the person tested.

## A

■ We first consider whether SmithKline owed Doe a duty to warn her or Quaker of the effect that ingestion of poppy seeds can have on a drug test.

Doe has not cited, and we are not aware of, a single decision of any court in the United States which recognizes the legal duty for which she argues. The United States Court of Appeals for the Fifth Circuit and intermediate courts of appeals in Illinois and Louisiana have held that a drug testing laboratory owes persons tested a duty to perform its services with reasonable care. *Willis v. Roche Biomedical Lab.,* 21 F.3d 1368, 1372–1375 (5th Cir.1994) (Texas law requires a laboratory to use reasonable care in conducting drug tests, citing the court of appeals' opinion in the case now at bar); *Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill. App.3d 659, 207 Ill.Dec. 96, 646 N.E.2d 930, 932–934 (1995) (laboratory owes prospective employee a duty not to contaminate sample and report a false result); *Nehrenz v. Dunn,* 593 So.2d 915, 917–918 (La.Ct.App.1992) (laboratory owes employee a duty to perform test in a competent manner); *Elliott v. Laboratory Specialists,* 588 So.2d 175, 176 (La.Ct. App.1991), *writ denied,* 592 So.2d 415 (La. 1992) (laboratory owes employee a duty to perform test in a scientifically reasonable manner); *Lewis v. Aluminum Co. of Am.,* 588 So.2d 167, 170 (La.Ct.App.1991), *writ denied,* 592 So.2d 411 (La.1992) (laboratory owes employee a duty to perform tests in a competent, non-negligent manner). *But see Herbert v. Placid Ref. Co.,* 564 So.2d 371, 374 (La.Ct.App.1990) (laboratory owed employee no duty to properly analyze test sample). Whether a laboratory is responsible to persons tested for negligently performing drug tests is not the issue before us. Doe does not complain that SmithKline failed to perform her drug test with reasonable care; she concedes that the test accurately identified opiates in her urine. Doe's complaint—her principal one, at least—is that SmithKline did not warn her and Quaker of the effects of eating poppy seeds on drug tests. No court

has imposed a duty on drug testing laboratories to warn test subjects about the possible influences on results.

Even on the issue addressed in the cases cited, the law is in a nascent stage. No court of last resort has spoken. There appears to be some disagreement among the intermediate courts of Louisiana. *Compare Nehrenz, Elliott and Lewis with Herbert.* And *Willis* is based solely, and erroneously, on the court of appeals' decision in the case now before us. The issues in the two cases are simply not the same. (Curiously, the Fifth Circuit did not regard this Court's having agreed to review the court of appeals' decision as relevant in evaluating its precedential value. *Willis,* 21 F.3d at 1374.)

In a different but somewhat related context, a few courts have applied a reasonable care standard to conducting polygraph tests when the results would be a factor in hiring and firing decisions. *Ellis v. Buckley,* 790 P.2d 875, 877 (Colo.Ct.App.1989), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 249 (1990); *Lawson v. Howmet Aluminum Corp.,* 449 N.E.2d 1172, 1177 (Ind.Ct. App.1983); *Zampatori v. United Parcel Serv.,* 125 Misc.2d 405, 479 N.Y.S.2d 470, 473–474 (N.Y.Sup.Ct.1984); *see Lewis v. Rodriguez,* 107 N.M. 430, 759 P.2d 1012, 1014–1016 (1988); *see also Mechanics Lumber Co. v. Smith,* 296 Ark. 285, 752 S.W.2d 763, 765 (1988) (summary judgment on negligence claim reversed, although the grounds are not clear). However, the only court of last resort in any American jurisdiction to clearly consider the issue has held that no tort duty to use reasonable care should be imposed on polygraph test operators. *Hall v. United Parcel Serv. of Am.,* 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273, 276–278 (N.Y.1990); *see also* Claudia G. Catalano, Annotation, *Employee's Action in Tort Against Party Administering Polygraph, Drug, or Similar Test at Request of Actual or Prospective Employer,* 89 A.L.R.4th 527, 540–545 (1991 & Supp.1994).

Absent any direct authority in this State or any other state for creating a duty to warn, we look to general tort principles for guidance. Section 551 of the *Restatement (Second) of Torts* recognizes a general duty to disclose facts in a commercial setting, which could encompass the duty Doe seeks in this case. Section 551 states:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

RESTATEMENT (SECOND) OF TORTS § 551 (1977).

This Court has cited section 551 only once, *Smith v. National Resort Communities,* 585 S.W.2d 655, 658 (Tex.1979), but has never embraced it as a rule of law in Texas. Even if we were to do so in this case, section 551 would not assist Doe. SmithKline had no "fiduciary or other similar relation of trust

and confidence" with Doe for subsection 551(2)(a) to apply. SmithKline made no representations to Doe whatever, so subsections 551(2)(b)–(d) do not apply. Subsection 551(2)(e) does not apply because SmithKline had no knowledge of what Doe believed about the drug test.

We have held in the context of fraud that when a duty to speak exists, silence may be as misleading as the positive misrepresentation of existing facts. *Spoljaric v. Percival Tours,* 708 S.W.2d 432, 435 (Tex.1986); *National Resort Communities,* 585 S.W.2d at 658. However, Doe does not allege fraud in this case, nor could she do so inasmuch as she had no contact with SmithKline.

Doe argues that our decision in *Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109 (1942), supports her position. In that case a bridge broke down when a truck crossed over it, not because of the weight of the truck or the negligence of the driver, but because of the bridge's deteriorated condition. Another motorist pointed out to the truck driver what had happened, but the truck driver made no effort to post a warning. Six days later plaintiffs were injured attempting to drive across the bridge. They sued the owner of the truck. In holding that defendant owed plaintiffs no duty to warn of the condition of the bridge, the Court wrote:

> There are many instances in which it may be said, as a matter of law, that there is a duty to do something, and in others it may be said, as a matter of law, that there is no such duty. Using familiar illustrations, it may be said generally, on the one hand, that if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby. On the other hand, it may be said generally, as a matter of law, that a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others.

*Id.* at 110. Doe argues that SmithKline was not a mere bystander in the circumstances of the present case but rather, created a dangerous situation—namely, the possibility that she would test positive when she had not used any drugs.

We disagree. SmithKline merely performed a urinalysis and reported the presence of certain drugs or their metabolites. It neither created nor controlled the use to which its test results would be put. It might have given Quaker advice that Quaker would have followed—to analogize to *Buchanan,* it might have tried to fix the bridge or warn of its defects—but it was under no obligation to Doe to do so. The very general principles stated in *Buchanan* do not support Doe's position.

This, however, is still not the end of our inquiry. While we can find no direct authority in this State or elsewhere, either in specific decisions or in general principles, for recognizing the duty Doe seeks in this case, this Court could recognize a new common law duty based on "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp.,* 801 S.W.2d at 525; *see Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Otis Eng'g,* 668 S.W.2d at 309; *Corbin v. Safeway Stores,* 648 S.W.2d 292, 296 (Tex.1983). We therefore examine these factors in the context of this case.

We assume that there is some significant likelihood, which SmithKline could and did foresee, that a person will have a positive drug test due to having eaten poppy seeds (although Quaker asserts that it has tested more than 4,000 people with only one such complaint). Foreseeability alone, however, is not sufficient to create a new duty. *Bird,* 868 S.W.2d at 769; *Boyles v. Kerr,* 855 S.W.2d 593, 599 (Tex.1993). We must consider the other factors as well.

The duty Doe seeks cannot be readily defined. It would require SmithKline to inform each test subject not only of the possible effect of poppy seeds but of all possible causes of positive results other than using drugs. Doe's own research, for example,

suggests that a positive drug test may also result from using an over-the-counter inhaler, or from inhaling second-hand marijuana smoke. The more possibilities that must be suggested to the person tested, the more excuses the person will have for positive results. Moreover, the duty Doe seeks would charge SmithKline with responsibility that belongs to its clients. In this case, for example, SmithKline recommended to Quaker that test subjects be asked to disclose before the test any medications being used, and that positive results be interpreted in light of such disclosure. It was Quaker's responsibility, however, to decide whether and how to implement such recommendations. SmithKline should be allowed to perform only the service it chose to offer and Quaker chose to procure—testing for the presence of drugs in the body. Finally, placing a duty on SmithKline in these circumstances impinges on the liability of other professionals for services rendered. A simple duty to warn of the possibilities that information may be misinterpreted is unworkable.

Without precedent and without the support of our own jurisprudence, we decline to recognize the duty Doe alleges in this case. We agree with a federal district court that has written:

> Although it may be true ... that the increasing use of drug testing for employment purposes raises serious questions concerning the duties owed by entities seeking and using the tests to current or prospective employees subjected thereto, the fact that there are reasons to be concerned about the uses, potential misuses or abuses of drug test results does not justify imposing additional and unprecedented duties upon a laboratory with the sole function of analyzing a sample and returning a report, particularly when such report is factually accurate.

*Caputo v. Compuchem Lab.*, 1994 WL 100084, at *4 (E.D.Pa., Feb. 23, 1994), *aff'd*, 37 F.3d 1485 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). In *Caputo*, a case with facts very similar to this one, the court declined to impose a duty on a drug testing laboratory to

perform follow-up testing on weak positive test samples or assure competent medical interpretation of test results absent a laboratory's contractual duty to do so. *Id.*

For the reasons we have explained, we hold that SmithKline had no duty to disclose to either Quaker or Doe any information about the effect of eating poppy seeds on a positive drug test result.

**B**

■ The court of appeals considered that SmithKline might be liable to Doe for negligently representing to Quaker that "a positive result from SBCL can be accepted with *virtual certainty* as evidence of drug use." Specifically, the court stated: "By making representations that implied the infallibility of its tests and by failing to provide any information to its customers on the possible implications of the raw test results, SmithKline created a possibility of misinterpretation of the information it provides." 855 S.W.2d at 256. The court continued: "we conclude that SmithKline has failed to conclusively demonstrate that it owed no duty to Doe." *Id.* Doe, however, did not plead misrepresentation. No such claim is included in her seven specific negligence allegations. Although Doe's petition does not confine itself to these allegations—defendants are alleged to have been negligent in "at least", rather than *only*, seven specific ways—it does not allude to any misrepresentation by SmithKline. A petition must give "fair and adequate notice of the facts upon which the pleader bases his claim." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982). Doe's petition give no notice at all of any claim of misrepresentation.

■ We do not, as a rule, give pleadings a too cabined reading. "A court should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged." *Boyles*, 855 S.W.2d at 601 (citing *Roark*, 633 S.W.2d at 809, and *Gulf, Colo. & S.F. Ry. v. Bliss*, 368 S.W.2d 594, 599 (Tex.1963)). Still, pleadings must give reasonable notice of the claims asserted. Thus, in *Boyles*, for example, we held that a claim for *grossly* negli-

gent infliction of emotional distress could not reasonably be inferred from allegations of simple negligent infliction of emotional distress. *Id.* By contrast, we had no difficulty in *Roark* reading allegations against a physician that a child sustained a fractured skull during delivery to assert an action for the negligent use of forceps. 633 S.W.2d at 810. Likewise, an allegation of proximate cause is rather obviously included in an allegation of sole cause because a sole cause must also be a proximate cause. *Gulf,* 368 S.W.2d at 599. The case before us is more like *Boyles* than *Roark* or *Gulf.* There is simply no reasonable way to read Doe's allegations as claiming misrepresentation.

 Even if Doe's petition could be read to implicitly include a misrepresentation claim, it was still not error for the district court to grant SmithKline's motion for summary judgment. "A defendant who conclusively negates at least one of the essential elements of each of the plaintiff's causes of action or who conclusively establishes all of the elements of an affirmative defense is entitled to summary judgment." *Cathey v. Booth,* 900 S.W.2d 339 (Tex.1995) (per curiam); *Wornick Co. v. Casas,* 856 S.W.2d 732, 733 (Tex.1993); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–311 (Tex.1984). A defendant need not, however, show that the plaintiff cannot succeed on any theory *conceivable* in order to obtain summary judgment; he is only "required to meet the plaintiff's case as pleaded." *Cook v. Brundidge, Fountain, Elliott & Churchill,* 533 S.W.2d 751, 759 (Tex.1976). When a plaintiff's petition alleges specific claims, but does not limit itself to those claims, a defendant is entitled to summary judgment if he disproves at least one element of each claim specifically pleaded unless plaintiff in response raises a genuine issue of material fact as to some other claim that might be brought within the general language of the petition.

Here, Doe did not raise an issue concerning any misrepresentation to defeat Smith-Kline's motion. The fair import of Doe's negligence claim in this case is that Smith-Kline was responsible for communicating to Quaker or Doe or both its knowledge that eating poppy seeds may influence drug test results. The court of appeals was obliged to confine its review of the summary judgment on negligence to this claim and erred in not doing so.

### C

 Doe alleges that SmithKline should have inquired whether she had eaten poppy seeds and should have investigated whether poppy seeds could have caused her positive test result. Doe also alleges that SmithKline had a duty to return her urine specimen to her. None of these claimed duties has any basis in law. SmithKline suggested to Quaker that it inquire of the persons tested what medications they were taking, but the decision to make such inquiry was clearly Quaker's. SmithKline could not force Quaker to make this inquiry, nor had it any right to make its own investigation. Also, Smith-Kline did not agree with persons tested to return urine specimens and had no other duty to do so.

### D

We emphasize that we have not considered whether a drug testing laboratory like SBCL has a duty to use reasonable care in performing tests and reporting the results. Doe does not claim such a duty in this case. Our consideration of the responsibility of drug testing laboratories is limited to the issues presented in this case.

### III

 SmithKline in its motion for summary judgment failed to negate that its conduct was not willful and intentional interference with the conditional offer of employment Quaker made to Doe. SmithKline did argue that its conduct could not have caused any damage to Doe because she lost her position at Quaker by fabricating the story about taking Vicodin. The summary judgment record is clear, however, that Quaker withdrew its offer of employment because Doe failed her drug test; only her reapplication was rejected because of the Vicodin story. Thus there is some evidence that SmithKline's conduct, if it was wrongful, caused at least part of Doe's damages. We therefore agree with the court of appeals that SmithKline failed to

establish its right to summary judgment on this claim. 855 S.W.2d at 258.

## IV

■ The court of appeals concluded that SmithKline did not have such a special relationship with Doe that it owed Doe a duty of good faith and fair dealing. 855 S.W.2d at 260. We agree. We have not recognized a relationship like the one between SmithKline and Doe as giving rise to such a duty. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). We decline to do so.

\* \* \* \* \* \*

Accordingly, we modify the judgment of the court of appeals to affirm summary judgment as to SmithKline on Doe's claims for negligence. As modified, we affirm the judgment of that court and remand the case for further proceedings on Doe's claim of tortious interference.

GAMMAGE, Justice, joined by HIGHTOWER and SPECTOR, Justices, dissenting.

Because the majority misuses this Court's precedents, the summary judgment record, and even Doe's own pleadings against her on the question of when a "duty" is raised, I dissent.

## I.

This is an appeal from a summary judgment for the defendant. SmithKline as movant had the burden to negate as a matter of law the facts supporting Doe's cause of action. *Wilcox v. St. Mary's University*, 531 S.W.2d 589, 592–93 (Tex.1975). It is not enough that Doe failed to prove or present evidence of elements of her case. SmithKline had to *disprove* at least one element as a matter of law. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). In stating the summary judgment "facts," the court must take all facts, evidence and inferences in the non-movant's favor; if there is any uncertainty or ambiguity, it must be resolved in favor of Doe. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546,

548–49 (Tex.1985); *Hudnall v. Tyler Bank & Trust Co.*, 458 S.W.2d 183, 185 (Tex.1970). The majority refuses to follow these standards.

The majority states there was "no evidence" that Quaker ever saw SmithKline's advertising brochure statement that "a positive result from SKBL can be accepted with *virtual certainty* as evidence of drug use." (Emphasis in original.) The summary judgment standard requires *SmithKline* to *negate as a matter of law* that Quaker saw it. SmithKline made no such showing. The absence of proof one way or the other must be taken in favor of Doe.

Beyond that, however, the majority purposefully ignores the reasonable inferences in favor of Doe that SmithKline did make the misrepresentation to Quaker, and that Quaker relied on it. The summary judgment record reflects that Julie Hanson, the manager of health services for Quaker, and John Mutchler, director of health, safety and environmental programs for Quaker, were primarily responsible for hiring SmithKline to process all of Quaker's drug screening samples. Hanson and Mutchler worked as part of a task force convened in order to consider drug screening and to hire a suitable testing company. Hanson testified that part of the task force's investigation was to review brochures from three different testing companies. SmithKline showed videotapes and made personal presentations to the task force. When asked whether SmithKline gave any promotional material, Hanson replied, "Oh, yes." She added that "They said that their tests were very accurate." She further asserted that Quaker selected Smith-Kline because it wanted to have "absolute certainty that the tests were accurate." Mutchler similarly testified that he recalled receiving SmithKline promotional literature, although he states he did not "spend much time on [it]." Doe's response to SmithKline's motion for summary judgment included copies of each of these depositions as permitted by Tex.R.Civ.P. 166a(d). While Doe may not have presented any direct evidence that Quaker saw the "virtual certainty" language in any of SmithKline's promotional materials, the evidence she did present raises the rea-

sonable inference that Quaker saw and relied on this claim.

The majority mentions that SmithKline's later advertising materials contain the disclaimer that "there is no way to completely eliminate this potential problem" that "certain types of poppy seeds, if consumed in sufficient quantity, can produce a positive result for opiates." There is no evidence that SmithKline gave this subsequent brochure to Quaker, nor that it told Quaker about the uncertainty before Doe's claim arose, and there is a reasonable inference this did not occur. According to the depositions of several Quaker employees, *if* Smith-Kline *had* told Quaker before Doe's test, the Doe incident would not have occurred. The reasonable inference from this summary judgment record, *taken favorably to Doe,* is that SmithKline itself discovered its error from Doe's misfortune and tried to correct it as to future customers. SmithKline did not use this brochure to disprove anything as a matter of law. Other than its potential for being taken as an admission against Smith-Kline, this brochure has *no legal relevance* to the summary judgment proceeding.

## II.

Our pleading rules also apparently do not apply in addressing Doe's petition. First, Doe makes a general negligence assertion, to which SmithKline failed to pursue its special exceptions. The specific negligence allegations are preceded by "in, *at least,* the following ways." (Emphasis added.) This allegation preserves every general negligence claim reasonably related to the identified incident that Doe may wish to make. *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993); *Roark v. Allen,* 633 S.W.2d 804, 809–810 (Tex.1982) (general negligence in delivery sufficient to raise negligent use of forceps by doctor); *Gulf, Colorado & Santa Fe Ry. Co. v. Bliss,* 368 S.W.2d 594, 599 (Tex.1963); *Higdon v. Shelton Motor Co.,* 138 Tex. 121, 157 S.W.2d 627, 627–28 (1942); *Scott v. Gardner,* 137 Tex. 628, 156 S.W.2d 513, 515 (Tex.1942).

What Doe does plead, liberally construed as we are supposed to do in a summary judgment case, adequately raises Smith-Kline's misrepresentation as a negligence claim. Subparagraphs 2 and 5, taken together, reasonably allege that SmithKline made the misrepresentation to Quaker that its drug test result meant the subject tested was using illegal drugs. What could be more specific than (5), which states that Smith-Kline was negligent in "[f]ailing to report the level of opiates found in plaintiff's urine test and failing to inform third persons, including plaintiff's prospective employer, that this level was consistent with poppy seed ingestion and not illicit drug use"? If the level of opiates found was consistent with poppy seed ingestion, it necessarily raises the misrepresentation issue as to the "virtual certainty" statement. In fact, the raw test data from SmithKline's laboratory, favorably interpreted for Doe, suggest that the lab technicians first found a borderline *negative* result for Doe, but that it was so close to their threshold value that they tested another portion of the sample, which went over the "line" set for positive results. SmithKline set the standards for a "positive" test, and should not have misrepresented what they meant. This pleading gave fair notice that the "virtual certainty" misrepresentation was raised. *See State Fidelity Mortgage Co. v. Varner,* 740 S.W.2d 477, 479–80 (Tex.App.—Houston [1st Dist.] 1987, writ denied); Tex.R.Civ.P. 45, 47. The majority abandons these established rules for liberally construing the pleading of the non-movant in a summary judgment proceeding.

The majority goes on to acknowledge there is a reasonable inference rule, but then observes that in *Boyles* the court held the pleading was not sufficient to raise the factual theory, whereas in *Roark* and *Gulf* it was. Without further explanation, the majority declares, "The case before us is more like *Boyles* than *Roark* or *Gulf.*" 903 S.W.2d at 355. The misrepresentation ground here is either expressly raised or, at the least, reasonably related to the incident identified in the pleadings to raise it under the liberal pleading construction rule. The majority simply declines to apply the rule.

Further, as an alternative holding, the majority discards the "reasonably related" rule by citation to *Cook v. Brundidge, Fountain, Elliott & Churchill,* 533 S.W.2d 751, 759

(Tex.1976), which supposedly states the defendant moving for summary judgment need only "meet the plaintiff's case as pleaded," which the majority suggests means narrowly pleaded. The majority quotes the *Brundidge* case out of context, and it simply does not stand for the proposition claimed. *Brundidge* does not state that grounds reasonably related are not deemed to be in issue. In the first place, in *Brundidge*, this Court *reversed* a summary judgment granted the defendants in the trial court and affirmed by the court of civil appeals. We held that under the liberal pleading and favorable inferences requirements, plaintiffs *did* raise a fact issue. In the second place, the whole quotation from *Brundidge* makes clear that "reasonably related" grounds must be negated by defendants:

> The summary judgment burden was that of establishing the negative of the statutory issues, namely, that Lyon was not apparently carrying on in the usual way the business of the law firm, i.e., was not acting in the ordinary course of its business and hence was not acting within the scope of apparent authority by force of statute. See *Torres v. Western Casualty & Surety Co.*, 457 S.W.2d 50 (Tex.1970); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970). The defendant is required to meet the plaintiff's case as pleaded and to demonstrate that the plaintiff cannot prevail. *Glenn v. Prestegord*, 456 S.W.2d 901 (Tex.1970); *Guidry v. Neches Butane Products Co.*, 476 S.W.2d 666 (Tex.1972). There can be no further burden upon the plaintiff if the requisite facts for summary judgment are not established by the summary judgment record. See *Torres, supra*, and *Box v. Bates*, 162 Tex. 184, 346 S.W.2d 317 (1961).

*Cook v. Brundidge*, 533 S.W.2d at 759. Clearly the context indicates that "meet the plaintiff's case as pleaded" means construed by the "reasonably related" rule for liberally construing the non-movant's pleadings.

The majority goes further and declares, without citation to authority, that "[w]hen a plaintiff's petition alleges specific claims but does not limit itself to those claims, a defendant is entitled to summary judgment if he disproves at least one element of each claim specifically pleaded unless plaintiff in response raises a genuine issue of material fact as to some other claim that might be brought within the general language of the petition." 903 S.W.2d at 355. In one fell swoop the majority reverses the summary judgment presumptions this Court has applied for more than a century. The majority shifts the burden of production of evidence to the plaintiff in situations heretofore requiring the defendant to produce evidence to negate claims. No longer, as the *Brundidge* case cited by the majority states, is it true that "There can be no further burden on the plaintiff" if defendant fails to negate an element of every cause of action raised by the pleading under the reasonably related test. Suddenly, and arbitrarily, defendants win, without necessity for special exceptions or other express rulings currently and historically envisioned by our rules, unless plaintiffs come back and expressly present proof of factual theories not explicitly in their pleadings. This is a major and significant change in the law, and it is calculated to disadvantage those seeking redress in our courts.

### III.

Contrary to the majority's analysis, this Court should recognize a duty from the drug testing company to Doe to not affirmatively misrepresent the significance of the test results to Quaker, her employer. The majority miscasts the controversy. It analyzes this case as a traditional negligent failure to disclose case, and discusses RESTATEMENT (SECOND) OF TORTS § 551 (1977). Section 551, by its context and express terms, is meant to apply only to commercial and business transactions that do not fit the employment drug testing context. Although it distinguishes the negligent misrepresentation ground, which the majority here expressly fails to reach, one case explains, perhaps better than any other, why neither negligent misrepresentation, nor its related theory of negligent failure to disclose, provides a proper vehicle for determining whether to recognize a duty in the employment testing situation. *Hall v. United Parcel Service*, cited by the majority for the *Hall* court's *other* conclusion that a

tort duty should not be recognized for polygraph testing, states:

> This line of cases [negligent misrepresentation], however, specifically concerns the extent to which a party who has negligently misrepresented facts may be held liable to those who have relied to their detriment on the misrepresentations. The cited cases are of limited analytical utility in resolving a case such as this, where the injury arose not as a result of the injured's reliance on negligently made statements but rather as a result of the direct impact that those statements had on the injured party's business and personal life. In that regard, this case is more analogous to one in which the test subject suffered physical injury by virtue of a negligently administered test than it is to the fact pattern presented in *Ossining* and its predecessors (*cf.*, *People v. Hamilton*, 125 A.D.2d 1000, 511 N.Y.S.2d 190 [civil damage suit on behalf of women victimized by "unnecessary touching" and unnecessary, sexually suggestive questioning by polygraph examiner]).

*Hall v. United Parcel Service*, 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273, 276 (1990).

The majority next erroneously concludes there is no "duty" from SmithKline to Doe. Conceding the foreseeability of great harm to Doe, the majority bases its conclusion on "other factors." The best that can be said for this analysis is that it gives precedence to imaginary business interests of Quaker, all absent from this summary judgment record, over the obvious personal interests of Doe. The summary judgment evidence raises a strong inference that Quaker *did care* about the meaning of the test results and wanted "absolute accuracy" from SmithKline. The majority lets purely theoretical concerns, such as "second hand" marijuana smoke or an employer who wants to be arbitrary and not inquire about the meaning and accuracy of the test, control disposition of this case, where such concerns are totally absent. The court should confine its consideration to whether the summary judgment facts in this case raise a duty on the testing laboratory not to misrepresent the meaning of its results.

For its conclusion that this court should not recognize a duty to Doe under these facts, the majority admits there is an analogy to polygraph testing cases but relies on what it says is the one "highest state court" decision on the issue, which rejects a common law polygraph testing duty—*Hall v. United Parcel Service*, 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273, 276 (1990). The analysis is more than faulty. First, the New York Court of Appeals in *Hall* is not the only highest state court to rule on the issue. In a summary judgment context, the Arkansas Supreme Court has ruled polygraph testing can raise a duty for a negligence cause of action. *Mechanics Lumber Co. v. Smith*, 296 Ark. 285, 752 S.W.2d 763, 765 (1988). The majority dismisses this case with a parenthetical notation that "summary judgment on negligence claim reversed, although the grounds are not clear." What is clear is that the Arkansas Supreme Court could not have reversed the negligence summary judgment if there were "no duty" from the polygraph testing company to the employee-plaintiff. The very annotation cited by the majority lists this Arkansas case as a "contrary" case to *Hall*, stating it "impliedly acknowledged a cause of action for such negligence" by reversing the summary judgment. Claudia G. Catalano, Annotation, *Employee's Action in Tort Against Party Administering Polygraph, Drug, or Similar Test at Request of Actual or Prospective Employer*, 89 A.L.R.4th 527, § 3 at 540 (1991). In addition, as cited below, the highest courts of Colorado and Louisiana denied certiorari review to decisions by their courts of appeals holding such causes of action exist. In the admittedly limited number of jurisdictions where the polygraph issue has arisen, more states have recognized a cause of action than have rejected it. *Id.* § 3 at 540–45. In cases involving drug testing, the jurisdictions appear to be about equally divided. *Id.* § 15, at 560–62 & 1994 Supp. 9. No case in any other jurisdiction relied upon *Hall* for its "no duty" holding.

Moreover, *Hall's* rationale would require that this court recognize the existence of a duty. The New York Court of Appeals reasoned that the state legislature had provided

statutory remedies for abuse by polygraph examiners, *Hall,* 555 N.E.2d at 276–77, and that the Federal Employee Polygraph Protection Act of 1988, 29 U.S.C. § 2001 *et seq.,* prohibited employer use of polygraphs except under limited circumstances and gave adequate statutory protection. *Id.* 556 N.Y.S.2d at 25, 555 N.E.2d at 277. Essentially, the court concluded that the legislatures, state and federal, had occupied the field and that it should decline to recognize common law actions which might conflict with statutory schemes. Polygraph testing statutes are not drug testing statutes. No one suggests there are such state statutes as to *drug testing* in Texas, nor have we found any such comprehensive federal statutes. The reasoning of *Hall* simply does not apply. To the contrary, the implication from *Hall* is that New York *would* recognize a duty for drug testing companies under the summary judgment facts presented here. Furthermore, the rule in Texas, contrary to the New York analysis in *Hall,* is that state legislative action or inaction does not preempt the common law landscape in the absence of an expressed intention to do so. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 310–11 (Tex. 1987).

Under this record, the court should address the question as straightforward negligence. "The common law doctrine of negligence consists of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from that breach." *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *see El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975).

Whether SmithKline owed a duty to Doe not to misrepresent the test's meaning to Quaker is a question of law. *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994); *Greater Houston,* 801 S.W.2d at 525; *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex. 1983) (quoting *Abalos v. Oil Dev. Co.,* 544 S.W.2d 627, 631 (Tex.1976)). When deciding whether a duty should be recognized this court considers "several interrelated factors, including the risk, foreseeability, and likeli-

hood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston,* 801 S.W.2d at 525; *see also Otis,* 668 S.W.2d at 309; *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 296 (Tex.1983).

Foreseeability of the risk is "the foremost and dominant consideration." *Greater Houston,* 801 S.W.2d at 525 (quoting *El Chico,* 732 S.W.2d at 311). The majority is correct that foreseeability *alone* is not sufficient to create a new duty. *Bird,* 868 S.W.2d at 769, *citing Boyles v. Kerr,* 855 S.W.2d 593, 599 (Tex. 1993); *Graff,* 858 S.W.2d at 920. Even where harm is foreseeable, as a general rule, "a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others." *Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109, 110 (1942). Only where the party created the dangerous situation or where the party enjoys a special relationship with the other party giving rise to a duty will this general rule not apply. *See Buchanan,* 159 S.W.2d at 110; *Otis,* 668 S.W.2d at 309; *El Chico,* 732 S.W.2d at 312. In my view, SmithKline both "created" the harmful situation by its misrepresentation and "enjoyed" a "special relationship" to those employees and prospective employees whose urine it tested at *their* risk of loss of employment. Contrary to the majority's faulty analogy to *Buchanan v. Rose,* SmithKline was not "a mere bystander" to the situation. SmithKline itself created the risk to Doe by its affirmative misrepresentation to Quaker that its test was a "virtually certain" indication of illicit drug use and its setting of the "positive" threshold for the drug testing at a level that could not exclude poppy seed foodstuff ingestion.

Several courts, recognizing the harm that may foreseeably result from an incorrectly conducted test, have held that a drug testing laboratory owes a duty to perform its services in a reasonable manner. *See, e.g., Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill.App.3d 659, 207 Ill.Dec. 96, 646 N.E.2d 930 (Ill.App.1995) (holding drug testing company owes prospective employee duty not to

contaminate sample and report a false result); *Nehrenz v. Dunn*, 593 So.2d 915, 917–18 (La.App.1992); *Elliott v. Laboratory Specialists, Inc.*, 588 So.2d 175, 176 (La.App. 1991, writ denied); *Lewis v. Aluminum Co. of America*, 588 So.2d 167, 170 (La.App.1991, writ denied) (holding that a drug testing company owes a duty to the employee to protect against false positive results in drug screening conducted for an employer or potential employer). A similar result was reached in several jurisdictions regarding polygraph tests where the results would be a factor in whether the employer would hire or continue to employ the test subject. *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo.App.1989), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 249 (1990); *Lawson v. Howmet Aluminum Corp.*, 449 N.E.2d 1172, 1177 (Ind. App.1983); *Lewis v. Rodriguez*, 107 N.M. 430, 432, 759 P.2d 1012, 1014 (N.M.App. 1988); *Zampatori v. United Parcel Service, Inc.*, 479 N.Y.S.2d 470, 473–73 (N.Y.Sup.Ct. 1984).

The situation in this case is somewhat different. Here, SmithKline performed the test *properly, and reported the scientific results accurately*, but allegedly harmed the test subject by virtue of its representations regarding the significance of those results. SmithKline engaged in at least two acts that *interpret* the results of drug tests. First, SmithKline did not merely report a number that indicated the amount of a specific chemical in Doe's urine. Instead, it created a benchmark above which a sample was labeled as "positive" and below which a sample was labeled as "negative." SmithKline used its professional judgment in order to decide where that benchmark should be. Second, its promotional literature advertised that a positive finding indicated, with "virtual certainty," evidence of drug use. The "virtual certainty" statement is a direct interpretation and an affirmative representation about the meaning of a positive result. The majority cites and quotes from *Caputo v. Compuchem Labs., Inc.*, 1994 WL 100084 (E.D.Pa., Feb. 23, 1994), *aff'd*, 37 F.3d 1485 (3d Cir. 1994), *cert. denied*, — U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), as a case "with facts very similar." The facts are not similar, however, because *Caputo* does not involve an affirmative misrepresentation of the meaning of a "positive" result. Furthermore, since *Caputo* is an unpublished Pennsylvania Federal District Court decision with a "noted only" affirmance by the Third Circuit Court of Appeals and "noted only" certiorari denial by the Supreme Court, it has limited or no precedential value for Texas jurisprudence.

I would hold that a drug testing laboratory with superior knowledge about its procedures has a duty to not make affirmative representations about the accuracy of those results to an employer in a manner that substantially distorts the significance that should reasonably be attached to them. Under this record, SmithKline failed to meet its burden to negate as a matter of law its breach of this duty. In this summary judgment case the majority errs in holding otherwise.

For the foregoing reasons, I dissent.