**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 00-51129

SELESTINO CALBILLO,

Plaintiff-Appellant,

versus

CAVENDER OLDSMOBILE, INC.; ET AL.,

Defendants,

ALLIED POLYGRAPH SERVICES, INC.;
POLYSOFT PRODUCTS, INC.,
doing business as Allied Investigations,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas

April 25, 2002

Before BARKSDALE and STEWART, Circuit Judges, and DUPLANTIER, District Judge.[*]

CARL E. STEWART, Circuit Judge:

Selestino Calbillo ("Calbillo") appeals the district court's grant of summary judgment in favor

of Allied Polygraph Services, Inc. and Polysoft Products, Inc. (collectively "Allied") on Calbillo's

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

negligence and Employee Polygraph Protection Act of 1988 (EPPA), 29 U.S.C. § 2001 et seq., claims. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Calbillo was employed by Cavender Oldsmobile, Inc. ("Cavender") as a parts counter technician in January 1998. In April 1998, Rohda Smid ("Smid"), the parts manager, began noticing that quantities of Freon were missing. Edward Hollas ("Hollas"), the general manager, confronted several employees, including Calbillo, about the missing Freon. In response to Hollas's questioning, Calbillo claimed that he did not know who was stealing the Freon.

In the fall of 1998, the decision was made by Cavender management to hire Donald Trease ("Trease"), a licensed private investigator and polygraph examiner, who is the principal operator of Allied. When Hollas asked Trease "what could be done" about the missing Freon, Trease recommended that Hollas interview the employees of the parts department. Trease complied with Hollas's request that Trease interview the employees on his behalf instead. Trease came to the dealership, toured the parts department, talked to management, and interviewed all of the employees in the parts department. During Calbillo's interview, he explained that he did not have a key to the cabinet where the Freon was stored. According to Calbillo, Trease told him that the other employees had agreed to take polygraph examinations and Trease asked whether he was willing to take the test as well. Calbillo agreed to take a polygraph examination; however, immediately after the interview, some of Calbillo's co-workers told him that they refused to take a polygraph examination.

Trease gave a verbal report to Hollas regarding the information that he gathered from the employees interviewed, which included other employees' suspicions that Calbillo stole the Freon. Trease also provided Hollas with a three-page standard package about polygraph testing, which

2

included information on the EPPA, rules and regulations pertaining to polygraph examination, and termination of employees. At Hollas's request, Trease spoke with Cavender's attorneys and discussed the EPPA, general procedures involved in a polygraph examination, and information acquired during the employee interviews. Following the employee interviews, Hollas requested that Trease administer a polygraph examination to Calbillo.

Hollas then demanded that Calbillo take a polygraph examination to prove that he was innocent of the theft as a condition of continued employment. Hollas explained that as a result of the investigation, Calbillo was chosen to take a polygraph examination based upon the way he answered Trease's questions. Hollas then gave Calbillo a piece of paper with an appointment time for the polygraph examination, and Calbillo signed it as instructed. According to Calbillo, Hollas also told him not to speak with an attorney or to bring an attorney to the examination.

Calbillo took the polygraph examination on October 6, 1998. He was read his rights relating to the polygraph examination prior to taking the examination. The examination consisted of three sets of twelve questions, with about twenty-five to thirty seconds between the individual questions and a few minutes between the sets of questions. After the first set of questions, Trease told Calbillo that he had "a deception of 99." At the end of the full examination, Trease reported the results to Calbillo and gave him a copy of the results. Calbillo claims that Trease also told him to "tell him who took the Freon" and said that he "was hiding something." Calbillo again responded that he did not know who took the Freon. Further, Trease reported the test results to Hollas. On the morning of October 7, 1998, Hollas informed Calbillo that he was terminated because he did not pass the polygraph examination.

Calbillo sued Cavender and Allied, alleging violations of the EPPA as well as state law claims of negligence and fraud, among other claims. On September 29, 2000, the district court granted Allied's motions for summary judgment and dismissed the case in its entirety.[1] This appeal followed.

DISCUSSION

I.    Standard of Review

A grant of summary judgment is reviewed *de novo*. Geoscan, Inc. of Tx. v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. Geoscan, 226 F.3d at 390. We review the facts drawing all reasonable inferences in the light most favorable to the non-movant. Id. The non-movant cannot avoid summary judgment, however, by merely making "conclusory allegations" or "unsubstantiated assertions." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

II.    The Employee Polygraph Protection Act

The district court entered summary judgment in favor of Allied on Calbillo's EPPA claims after concluding that Allied was not an employer subject to liability under the EPPA. Calbillo v. Cavender Oldsmobile, Inc., No. Civ.A.SA-99-CA-85-FB, 2000 WL 33348243, at *12 (Sept. 29, 2000 W.D. Tex.). The court observed that in order for Calbillo to recover under the EPPA, Allied

---

[1]Calbillo settled his claims against Cavender prior to the district court's ruling on Allied's motions for summary judgment.

4

must qualify as an "employer" as defined by the EPPA. Id. at \*7. The court further adopted the view that the determination of whether a polygraph examiner is an employer under the EPPA requires consideration of whether the examiner exerted control, as a matter of economic reality, over the employer's compliance with the EPPA. Id. at \*12. After reviewing Calbillo's allegations and the evidence put forth in support thereof, the court noted that most of the allegations concerned actions taken by Trease in his role as a private investigator, not as a polygraph examiner. Id. at \*9-10. Placing much emphasis on Hollas's "uncontroverted" affidavit concerning Trease's role, the court concluded that, other than Calbillo's speculation to the contrary, there was no evidence that Trease, acting in his role as investigator or polygraph examiner, exerted control over Cavender's compliance with the EPPA. Id. at \*11-12. The court found it compelling that "[t]he decision to polygraph, who to polygraph, and the decision to terminate" were all ultimately made by Cavender. Id.

Calbillo argues that summary judgment on his EPPA claim was inappropriate because a genuine issue of material fact exists as to whether Allied qualified as an employer under the EPPA. Calbillo's appeal thus presents an issue of first impression in this circuit: whether and under what circumstances a polygraph examiner is an "employer" within the meaning of the EPPA's definition of that term. The EPPA makes it illegal for an employer to require or request that an employee take a polygraph examination. 29 U.S.C. § 2002(1). Employers are also prohibited from discharging any employee who fails or refuses to take a polygraph examination. Id. at § 2002(3). Congress created a limited exemption that permits an employer to request an employee to submit to a polygraph examination if it "is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft." Id. at § 2006. The EPPA provides for private enforcement by creating a cause of action for employees against "an *employer* who violates [the

5

EPPA] . . . for such legal or equitable relief as may be appropriate." Id. at § 2005(c)(1) (emphasis added). The EPPA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee." Id. at § 2001(2). Pursuant to the Secretary of Labor's duty to "issue such rules and regulations as may be necessary or appropriate to carry out [the EPPA]," id. at § 2004(a), the Secretary promulgated the following regulation:

> The term employer means any person acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee. A polygraph examiner either employed for or whose services are otherwise retained for the sole purpose of administering polygraph tests ordinarily would not be deemed an employer with respect to the examinees.

29 C.F.R. § 801.2(c) (2001).

Although we have found no circuit court of appeals case law considering whether a polygraph examiner can qualify as an employer under the EPPA, the existing district court authority is consistent with the Western District of Texas's approach in Calbillo. All four district courts that previously addressed the issue concluded that a polygraph examiner can sometimes constitute an employer under the EPPA, and all four applied the "economic reality" test in reaching their conclusions. See James v. Professionals' Detective Agency, Inc., 876 F. Supp. 1013, 1016 (N.D. Ill. 1995); Kluge v. O'Reilly Auto., Inc., No. 94-2159-GTV, 1994 WL 409575, at *9-10 (D. Kan. Aug. 3, 1994); Fallin v. Mindis Metals, Inc., 865 F. Supp. 834, 840 (N.D. Ga. 1994); Rubin v. Tourneau, Inc., 797 F. Supp. 247, 249-53 (S.D.N.Y. 1992). The Southern District of New York was the first court to examine the meaning of "employer" in the context of a suit against a polygraph examiner under the EPPA. In Rubin, the court analyzed the term "employer" under the EPPA and compared it to the definition of "employer" in the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201

6

et seq.[2] 797 F. Supp. at 251. After determining that the term "employer" under the EPPA should be construed similarly to judicial interpretations of the word for purposes of the FLSA, the court concluded that since the meaning of "employer" under the FLSA includes those who, as a matter of economic reality, exercise some degree of control over an employee's terms and conditions of employment, an "economic reality" test was appropriate for the EPPA as well. Id. at 251-52. Thus, the court held that a polygraph examiner was an employer under the EPPA only where, "as a matter of economic reality, [the polygraph examiner] exerts some degree of control over the employer's compliance with the EPPA." Id. at 253. The district courts in Fallin, Kluge, James, and Calbillo followed Rubin in applying the "economic reality" test.

Calbillo urges us to apply the plain meaning of the statutory and regulatory definitions of "employer," as opposed to the "economic reality" test. He contends that a polygraph examiner hired by an employer to administer an examination may be considered an employer and subject to suit under the EPPA if the examiner's services were not retained *solely* for the purposes of administering the examination. While the EPPA's definition of employer is broad and what constitutes "acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee" is ambiguous, we decline to adopt a *per se* rule that a polygraph examiner is subject to suit under the EPPA if he or she has any role in a theft

---

[2]Under FLSA, employer

> *includes any person acting directly or indirectly in the interest of an employer in relation to an employee* and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203(d) (emphasis added).

investigation beyond administering the examination. The Secretary's regulation does not clarify when a polygraph examiner is deemed an employer under the EPPA, it merely attempts to "exclude [from the EPPA's definition of employer] a polygraph examiner employed for the sole purpose of conducting a polygraph test." 56 Fed. Reg 9046-01 (Mar. 4, 1991).

We conclude that the "economic reality" test is the better approach; thus, whether a polygraph examiner is an employer under the EPPA requires consideration of whether the examiner went beyond the role of an independent entity, and exerted control, as a matter of economic reality, over the employer's compliance with the EPPA. This conclusion is consistent with the EPPA's definition and the Secretary's carefully phrased regulation which "*ordinarily*" protects a polygraph examiner from liability if he or she is hired solely for the purpose of conducting a polygraph examination. 29 C.F.R. § 801.2(c) (emphasis added). If the examiner is hired for the sole purpose of administering an examination, then, as a matter of economic reality, the examiner is generally not "acting . . . in the interest of an employer in relation to an employee or prospective employee," and, therefore, is not subject to suit under 29 U.S.C. § 2005(c)(1).

When examining the degree of control necessary to treat a polygraph examiner as an employer for purposes of the EPPA, district courts have considered whether the examiner (1) decided that a polygraph examination should be administered; (2) decided which employee would be examined; (3) provided expertise or advice to the employer regarding compliance with the EPPA's requirements, or the employer relied on the examiner to ensure compliance; or (4) decided whether the examined employee would be subjected to disciplinary action, or merely reported the results of the polygraph examination to the employer. See Calbillo, 2000

8

WL 33348243, at \*12; <u>Kluge</u>, 1994 WL 409575, at \*3; <u>Fallin</u>, 865 F. Supp. at 840; <u>Rubin</u>, 797 F. Supp. at 253. We do not, and need not, further define the scope of the "economic reality" test in determining whether Allied exercised enough control over Cavender's compliance with the EPPA to warrant being considered an employer.

Here, there is no evidence that Trease made the decision to polygraph or decided who to polygraph. Although there is evidence that Trease was involved in the decision to *interview* Cavender employees regarding the missing Froen, Trease made this recommendation in his role as a private investigator, not as a polygraph examiner. The evidence in the record is insufficient to support Calbillo's contention that Trease was also involved in the decision to *polygraph* Calbillo.[3] There is no evidence that Trease provided guidance to ensure that Cavender would comply with the provisions of the EPPA or that Trease was hired to ensure such compliance.[4] As the district court concluded, the evidence

---

[3]In support of his contention, Calbillo claims that "[Trease] and Hollas discussed Calbillo as a 'suspect' and Trease had already asked Calbillo if he would submit to a polygraph examination." However, Trease merely states in his deposition that he reported to Hollas that some of the employees Trease interviewed suspected Calbillo. This statement, even combined with asking Calbillo if he would take a polygraph examination, does not lead to a reasonable inference that Trease was involved in the decision to polygraph Calbillo.

[4]Calbillo asserts that Trease admitted in his deposition that he gave "legal advice" to Cavender's attorneys regarding the EPPA and the legal procedures for polygraph examination. Allied argues, however, that Trease did not give "legal advice" to Cavender. As the district court pointed out, Trease states in his deposition that "I'm not an attorney, I don't give legal advice." Further, Hollas's affidavit states that "Trease did not offer legal advice at any time to Cavender, and neither Cavender nor myself sought legal advice at any time from Mr. Trease." Although the record shows that Trease did have discussions with Cavender's attorneys, the content of these conversations is unclear. Trease states in his deposition that the attorneys "had some questions about the general procedures," that one topic of discussion was the EPPA, that they discussed "some of the section numbers from the law," and that he provided them with information gathered during the employee interviews that they needed in order to fill out a form. While it is reasonable to infer from the record that Trease may have answered the attorneys' questions regarding the technical procedures involved in performing

9

in the record shows that Cavender decided Calbillo should undergo a polygraph examination[5] and subsequently terminated Calbillo, and that Trease was hired as a private investigator to interview employees and as a polygraph examiner to perform a polygraph examination on Calbillo. Accordingly, based on the record presented, we find that Calbillo failed to create a genuine issue of material fact as to whether Allied exercised sufficient control over Cavender's compliance with the EPPA to qualify as an employer.

III.     Negligence

To recover under a negligence cause of action, Calbillo must establish that Allied owed a legal duty to him, and then, that Allied breached the duty and Calbillo suffered damages proximately caused by the breach. See, e.g., Mellon Mortgage Co. v. Holder, 5 S.W.3d 654, 663 (Tex. 1999). The district court held that Allied owed no legal duty to use reasonable care in conducting the employee investigation and administering the polygraph examination, much less a duty to adhere to a professional standard of care as urged by Calbillo. Calbillo, 2000 WL 33348243, at *4. The district court found no Texas law on the issue of whether an investigator or polygraph examiner owes a duty to an examinee, and thus

---

a polygraph examination and he might have even discussed some of the general requirements under the EPPA and the Secretary's regulations, it is not reasonable to infer that Cavender's attorneys were seeking, or that Trease provided them with, "legal advice." Cavender employed its own attorneys to ensure compliance with the EPPA.

[5]The district court placed much reliance on Hollas's "uncontroverted" affidavit which states, among other things, that Hollas was "directly involved in the decision to request a polygraph examination of Selestino Calbillo." Despite Calbillo's argument that Hollas's affidavit is "controverted" because Hollas did not say that he was the sole decisionmaker and he did not identify others involved in the decision, Hollas did state that "Trease was not involved in making the decision to polygraph Selestino Calbillo." Calbillo has failed to create a genuine issue of material fact in support of his contention otherwise.

the court relied on the law of negligence as it applies to claims against investigators hired by insurance companies, where Texas courts have held that investigators do not owe a duty to the insured because there is no privity of contract. See, e.g., Dagley v. Haag Eng'g Co., 18 S.W.3d 787, 791 (Tex. App. 2000).

We must resolve whether under Texas law, an independent polygraph examiner hired by an employer to conduct polygraph examinations owes a duty to employees tested to perform its services with reasonable care. The existence of a legal duty is a threshold inquiry, "which is a question of law for the court to decide." Mellon Mortgage Co., 5 S.W.3d at 663. Although federal subject matter jurisdiction for this case is not grounded in diversity of citizenship, we nonetheless recognize our duty to apply Texas law. Erie R.R. v. Tompkins, 304 U.S. 64 (1938). The Texas courts, however, have not yet directly addressed the specific issue before us. In making an Erie guess, "[w]e are emphatically not permitted to do merely what we think best; we must do that which we think the [Texas] Supreme Court would deem best." Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 397 (5th Cir. 1986) (en banc).

In determining whether a legal duty exists, Texas courts "consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990). In SmithKline Beecham Corp. v. Doe, the Supreme Court of Texas examined these factors in the context of whether an independent laboratory hired by an employer to conduct drug screening tests has a duty to warn an employee or prospective employee that ingestion of poppy seeds could cause a positive test

11

result. 903 S.W.2d 347, 353-54 (Tex. 1995). The court held that such a duty did not exist. Id. at 354.

Our decision in Willis v. Roche Biomedical Laboratories, Inc. relied on SmithKline in making an Erie guess as to whether under Texas law, a drug testing laboratory has a duty to use reasonable care in testing an employee's urine for drugs. 61 F.3d 313, 315-16 (5th Cir. 1995). In Willis, an employer placed its employee on restricted work duty and required him to see a physician, attend counseling sessions, and submit to follow up drug testing after a random drug test revealed the presence of methamphetamine in his urine. The laboratory subsequently informed the employer that the test had registered a "false positive." The employee sued the laboratory for negligence, claiming that the laboratory owed him a duty to use reasonable care in its administration of the drug test. Affirming the district court, we held that this duty did not exist under current Texas law. Id. at 316. In doing so, we acknowledged that although the Supreme Court of Texas emphasized in SmithKline that it was not considering whether a drug testing laboratory owed a duty of reasonable care to persons tested, "we must consider what the court did say in determining what Texas law is." Id. We found it persuasive that while the Texas Supreme Court "noted that some jurisdictions had held that a laboratory owes a duty to persons tested to perform its services with reasonable care," it pointed out that " '[n]o court of last resort has spoken' " on this duty of reasonable care and "question[ed] the soundness of the decisions finding such a duty." Id. (quoting SmithKline, 903 S.W.2d at 352). We also recognized that in reviewing decisions in the "related context" of whether polygraph examiners owe a duty of reasonable care to

12

persons tested, the Supreme Court of Texas noted that the only high court to consider the issue did not impose a reasonable standard of care.  Id.

With the benefit of the Texas Supreme Court decision in SmithKline and our prediction in Willis, we now make the necessary Erie guess.  In SmithKline, the court noted that "[i]n a different but somewhat related context, a few courts have applied a reasonable care standard to conducting polygraph tests when the results would be a factor in hiring and firing decisions."  SmithKline, 903 S.W.2d at 352 (citing Ellis v. Buckley, 790 P.2d 875, 877 (Colo. Ct. App. 1989); Zampatori v. United Parcel Serv., 479 N.Y.S.2d 470, 473-74 (N.Y. Sup. Ct. 1984); Lawson v. Howmet Aluminum Corp., 449 N.E.2d 1172, 1177 (Ind. Ct. App. 1983); and Lewis v. Rodriguez, 759 P.2d 1012, 1014-16 (N.M. Ct. App. 1988)).  Calbillo cites those same decisions in arguing that Allied owed him a duty to use reasonable care in its administration of the polygraph examination, and points out that Lewis went even further by holding polygraph examiners to a professional standard of care.  759 P.2d at 1016.  As we observed in Willis, however, t he Texas high court also stated that "the only court of last resort in any American jurisdiction to clearly consider the issue has held that no tort duty to use reasonable care should be imposed on polygraph test operators."  SmithKline, 903 S.W.2d at 352 (citing Hall v. United Parcel Serv. of Am., 555 N.E.2d 273, 276-78 (N.Y. 1990)).  Although in Willis we refused to recognize a new Texas common law duty of reasonable care that a drug testing laboratory owes to the persons tested, as opposed to a duty that a polygraph examiner owes an examinee, we did note that these two contexts were related.  Seeing little difference between this case and Willis, we decline to recognize the duty that Calbillo alleges.  We find that under current Texas law, Allied owed Calbillo no duty of

13

reasonable care in administering the polygraph examination.  The nonexistence of a duty ends

our inquiry into whether Allied may be held liable for negligence.[6]


## CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of Allied.

AFFIRMED.

---

[6]Therefore, we need not review the district court's finding that, even assuming that Allied was required to exercise the degree of care consistent with its superior knowledge and skill, "there is no evidence, not even from the plaintiff's experts, that any standardized degree of care was violated." Calbillo, 2000 WL 33348243, at *4.