[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 29, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14949
Non-Argument Calendar
_____

D. C. Docket No. 03-00056-CV-RV

SABRINA POLKEY,

Plaintiff-Appellee,

versus

TRANSTECS CORPORATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 29, 2005)

Before BLACK, BARKETT and PRYOR, Circuit Judges.

PER CURIAM:

Transtecs Corporation appeals the district court's award of summary

judgment to Sabrina Polkey on her claim that Transtecs requested her to take a polygraph exam, in violation of the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2002(1) (2005). Transtecs argues that summary judgment was inappropriate because the district court erred as a matter of law in concluding that a request to take a polygraph exam alone constitutes an EPPA violation. Transtects further contends that its polygraph request falls within two of the EPPA's exemptions: (i) the national defense and security exemption, 29 U.S.C. § 2006(b); (ii) the ongoing investigation exemption, 29 U.S.C. § 2006(d). We agree with the district court that Transtecs cannot claim either the ongoing investigation nor national defense exemptions, and that its polygraph request violated the plain terms of the EPPA.

## BACKGROUND

Under a contract with the Department of Defense ("DOD"), Transtecs performed mailroom services at the Pensacola Naval Air Station ("NAS").[1] Polkey worked in the NAS mailroom for Transtecs' contractual predecessor since 1998, and served as mailroom supervisor for Transtecs since October 1, 2000. Aside from Polkey, Transtecs employed five clerks at the NAS mailroom.

On Friday, September 28, 1998, after the mailroom had closed for the day,

---

[1]Under the contract, Transtecs and its employees have access to "official use only" material, but are denied access to most other forms of classified material.

Polkey returned to the mailroom to retrieve an item she had forgotten in the refrigerator. She then discovered that the front desk computer had been left on. When she turned it off, she discovered fourteen opened and undelivered Christmas cards in the wastebasket near the front computer. Polkey immediately contacted her supervisor, Carl Kirtley, and requested that he come to the mailroom. Polkey told Kirtley that mailroom employee Ronnie Cole had been primarily assigned to the front desk that day. In the wastebasket, Kirtley found Cole's pay stub along with the undelivered mail.

After discussing the matter with DOD personnel and Transtecs' management, both Kirtley and a civilian investigator questioned the six mailroom employees, each of whom denied opening the mail. Nonetheless, Kirtley suspected that Cole was responsible,[2] though he hadn't eliminated the other employees.

After consulting with Transtecs' management, Kirtley arranged for polygraph testing of all the mailroom employees at Transtecs' expense. Transtecs contends that it had already determined that all the mailroom employees would be fired unless one admitted to the wrongdoing, but arranged for polygraph exams to absolve the company of any wrongdoing in the event the DOD pursued charges against the perpetrator.

---

[2]Cole had already given notice to Transtecs that he intended to end his employment, scheduling his last work day for January 17, 2002.

Kirtley held a meeting with the mailroom employees, during which he requested that each of them submit to a polygraph exam. He explained that the examination was voluntary, and asked each to sign a general release form. The form did not contain information about the mail tampering incident, did not state the basis for testing each employee, and was not signed by any Transtecs official. Each employee signed the form. Kirtley scheduled Cole for a polygraph test that same afternoon.

The following day, Kirtley received an oral report of the polygraph exam results that indicated deception when Cole denied opening the mail. According to Kirtley, he conveyed this information to Godwin Opara, Transtecs' president. Opara denies this, claiming that Kirtley told him the test results were inconclusive. While Kirtley claims he could not rule out any employee positively, he concedes that after learning of Cole's test results, he had no reason to suspect that Polkey was involved in any way with the opening of the mail.

Kirtley then scheduled another meeting with the mailroom employees[3] and encouraged each of them to take the optional polygraph exam to clear their name. Polkey and other employees expressed concern over the reliability of polygraph exams, fearing that the exam might inaccurately implicate them. All the

---

[3]Cole had since ended his employment with Transtecs and was never confronted with the results of his polygraph exam.

employees ultimately refused to submit to the exam. Kirtley informed Opara of this decision.

Less than one week later, Polkey was fired, ostensibly for permitting package deliveries through the mailroom's back door, in contravention of NAS security procedures.[4]

## STANDARD OF REVIEW

In examining summary judgments, our review is plenary. Penalty Kick Management v. Coca-Cola Co., 318 F.3d 1284, 1290 (11th Cir. 2003). We thus view the facts in the light most favorable to the non-moving party, and examine the district court's conclusions of law de novo. Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1254-55 (11th Cir. 2004). We will affirm the grant of summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## POLYGRAPH REQUESTS UNDER THE EPPA

Under the EPPA, it is unlawful for a covered employer to "directly or indirectly, require, request, suggest, or cause any employee . . . to take or submit to

---

[4]Polkey's suit alleged two separate violations of the EPPA: (i) an unlawful polygraph exam request under § 2002(1); and (ii) an discharge based on her refusal to submit to a polygraph exam, in violation of § 2002(3)(a). Following the district court's grant of summary judgment to Polkey on her "request" claim, the parties settled the remaining counts, and stipulated to nominal damages on Polkey's "request" claim. We thus do not address Polkey's EPPA dismissal claim, nor recite the facts relevant thereto.

5

any lie detector test." 29 U.S.C. § 2002(1) (emphasis added). Because the statute is phrased in the alternative, its plain language prohibits an employer from requesting or suggesting that an employee submit to a polygraph exam, even where the test is ultimately not administered and no adverse employment action is taken as a consequence.[5] See Garcia v. United States, 469 U.S. 70, 73-74 (1984) (when statutory nouns are connected by "or" each must be given its own separate meaning). Because the statute's meaning on this point is clear and unambiguous, its plan language controls our analysis. United States v. Fisher, 289 F.3d 1329, 1337-38 (11th Cir. 2002).

Transtecs urges an alternative construction of the EPPA, one which would essentially read the "request or suggest" language out of the statute. In Transtecs' view, the EPPA should not be interpreted to prohibit polygraph exam requests, for such a construction would render superfluous the statute's separate prohibitions on

---

[5] Because the EPPA's broad prohibitions have virtually eliminated polygraph exams from the workplace, there is little precedent interpreting the statute. See, e.g., Mennen v. Easter Stores, 951 F.Supp. 838, 848 (N.D. Iowa 1997) ("although Congress passed the EPPA eight years ago, a court applying the Act still finds itself in relatively unchartered territory, as case law applying the EPPA is scarce"). Nonetheless, those courts confronted with the issue have likewise interpreted the EPPA to prohibit an employer from requesting a polygraph exam from an employee, even where the exam is ultimately not administered. See Albin v. Cosmetics Plus, Ltd., No. 97 Civ. 2670, 1997 U.S. Dist. LEXIS 15217 at *5 (S.D.N.Y. Oct. 6, 1997); see also Calbillo v. Cavender Oldsmobile, Inc., 288 F.3d. 721, 726 (5th Cir. 2002) ("the EPPA makes it illegal for an employer . . . to request that an employee take a polygraph examination"); Hossaini v. Western Mo. Med. Ctr., 140 F.3d 1140, 1143 (8th Cir. 1998) ("among other things, [the EPPA] prohibits employers from requesting . . . an employee to take or submit to a polygraph examination").

requiring employee polygraphs or using the results to take adverse employment action. Transtecs further argues that the paucity of reference to the "request or suggest" language in the EPPA's legislative history supports its interpretation.

However, the Supreme Court has made clear "time and time again" that all canons of statutory interpretation, including legislative history and the disfavor for interpretations that render other statutory provisions superfluous, are mere rules of thumb which must always yield to plain and unambiguous statutory text. Connecticut National Bank v. Germain, 503 U.S. 249, 253 (1992). Because the statutory text clearly prohibits a covered employer's request or suggestion that an employee submit to a lie detector exam, the EPPA's language both begins and ends our inquiry. Id. Thus, the district court did not err in concluding that Transtecs violated the EPPA by "requesting" or "suggesting" that Polkey take a polygraph test.

THE NATIONAL DEFENSE EXEMPTION

The EPPA provides that its prohibitions will not be "construed to prohibit the administration, by the Federal Government, in the performance of any counterintelligence function, of any lie detector test" to an employee of a contractor of the Department of Defense ("DOD"). 29 U.S.C. § 2006(b)(1). Transtecs argues that as it operated the mailroom where Polkey worked under a

7

DOD contract that provided for a "secret" clearance level, it was engaging in "counterintelligence operations" that triggered the national defense exemption.

Transtec's argument fails because the national defense exemption applies, by its own terms, only to the federal government. The statute does not purport to allow defense contractors to administer or request polygraph exams from their employees; rather, the national defense exemption extends only to the federal government. Indeed, any hint of ambiguity on this point is resolved by the regulations implementing the EPPA[6], which explicitly state that the national security exemptions "apply <u>only</u> to the federal government; they do not allow private employers / contractors to administer such [lie detector] tests." 29 C.F.R. § 801.11(a) (emphasis added). As a private contractor, Transtecs' attempted reliance on the national security exemption is thus misplaced.[7]

THE LIMITED EXEMPTION FOR ONGOING INVESTIGATIONS

The EPPA's prohibitions do not prohibit a covered employer from requesting a polygraph exam, where the employer demonstrates that: (i) the test is

---

[6]The EPPA grants the Secretary of Labor the authority to issue rules and regulations to implement the statute. 29 U.S.C. § 2004(a)(1). We defer to these regulations, as the agency interpretation is reasonable and not manifestly contrary to Congressional intent. <u>Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-45 (1984).

[7]Because we conclude that the EPPA's national security exemption applies only to the federal government, we need not reach the question of whether Transtecs' mailroom operations could possibly constitute a "counterintelligence function."

8

administered in connection with an ongoing investigation involving economic loss or injury to the employer's business; (ii) the employee had access to the subject of the investigation; (iii) the employer has a reasonable suspicion as to the employee's involvement in the loss; and (iv) the employer provides the employee with a signed written notice that specifically identifies the economic loss at issue, indicates that the employee had access to the property being investigated, and describes the basis for the employer's reasonable suspicion. 29 U.S.C. § 2006(d)(1-4). As the statute is phrased in the conjunctive, an employer must comply with each of these requirements for the ongoing investigation exemption to apply. See Lyle v. Mercy Hospital Anderson, 876 F.Supp. 157, 162 (S.D. Ohio 1995) (holding that employer "may only claim the ongoing investigation exemption by demonstrating that it meets all the elements of the exemption"); see also, 29 C.F.R. § 801.12(h) ("failure to satisfy any of the specified requirements nullifies the statutory authority [provided by the ongoing investigation exemption]"). It is undisputed that Transtecs' polygraph request satisfied the first two elements of the exemption, as it was conducting an ongoing investigation into the Christmas card tampering incident, and Polkey did have access to those cards and the receptacle in which they were discovered. Transtecs' entitlement to the exemption thus rests on its compliance with the reasonable suspicion and written notice requirements.

9

As an initial matter, we agree with the district court's holding that Transtecs was not required to provide Polkey with the signed written notice required by § 2006(d)(4) at the time of its polygraph request.[8] The statute requires only that the statement be "provided to the examinee before the test." 29 U.S.C. § 2006(d)(4).[9] The statute differentiates between "employees" and "examinees": while the other elements of the ongoing investigation exemption apply to "employees" more broadly, only "examinees" must be provided with a signed written notice. Because Polkey ultimately refused the polygraph exam, she never became an "examinee", and Transtecs accordingly never became obligated to provide her with the signed written notice required by § 2006(d)(4).

Nonetheless, Transtecs' reliance on the ongoing investigation exemption fails because it cannot satisfy its burden of establishing reasonable suspicion of Polkey's responsibility for the Christmas card incident. While the statute does not clarify what constitutes a "reasonable suspicion," the regulations define it as "an

---

[8]None of the parties provided the district court with the release form provided to Polkey at the time of its request, and Transtecs personnel testified that the form was not retained by the company. However, it is undisputed that the form does not meet the standards imposed by § 2006(d)(4), as it did not contain any information about the incident, did not state the basis for testing any individual employee, and was not signed by any Transtec officer. Furthermore, we note that Transtecs' failure to retain the form, standing alone, contravenes 2006(d)(4)(c), which requires an employer who seeks to rely on the ongoing investigation exemption to retain the required notice for three years.

[9]The implementing regulations have interpreted this provision to require at least 48 hours between the time the examinee is provided with the statement and the test administration. 29 C.F.R. § 801.12(g)(2)

observable, articulable basis in fact which indicates that a particular employee was involved in, or responsible for, an economic loss." 29 C.F.R. § 801.12(f)(1). Access to the property and potential opportunity, standing alone, cannot constitute reasonable suspicion. Id.

By the time Transtecs' made its second polygraph request of Polkey, Polkey's supervisor conceded that he had no reason to suspect that Polkey was involved in the mail opening incident. Instead, at the time of Transtecs' second request, the company aimed to test all of its employees only in order to absolve the company of any responsibility for the theft. To allow such blanket testing under the ongoing investigation exemption would vitiate § 2006(d)(3)'s requirement of reasonable suspicion as to each individual employee.

We thus agree with the district court that Polkey was entitled to summary judgment on Transtecs' second polygraph request, as at the time the company lacked reasonable suspicion as to her involvement in the mail incident.

**AFFIRMED**.