[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-15726

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 20, 2006
THOMAS K. KAHN
CLERK

D. C. Docket Nos. 02-02429-CV-C-W & 02-02430-CV-C-W

7:02-cv-2429

GARY LEE WATSON,

Plaintiff-Appellant,

versus

DRUMMOND COMPANY, INC.,
MIKE ZERVOUS, individually
and in his official capacity as
President of Drummond Coal Company,
UNITED MINE WORKERS OF AMERICA, et al.,

Defendants-Appellees.

_____
7:02-cv-2430

CLOY WYMAN OWENS,
CLARENCE E. GAINES, et al.,

Plaintiffs-Appellants,

versus

DRUMMOND COMPANY, INC.,
MIKE ZERVOUS, individually
and in his official capacity as
President of Drummond Coal Company,
UNITED MINE WORKERS OF AMERICA, et al.,

Defendants-Appellees.

_____
7:02-cv-2431

EDDIE J. TUCKER,

Plaintiff-Appellant,

versus

DRUMMOND COMPANY, INC.,
MIKE ZERVOUS, individually
and in his official capacity as
President of Drummond Coal Company,
UNITED MINE WORKERS OF AMERICA, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(January 20, 2006)**

Before ANDERSON,  BLACK and CARNES, Circuit Judges.

ANDERSON, Circuit Judge:

In this set of consolidated appeals, plaintiffs are former or current

employees of the Drummond Company, Inc. ("the Company") and members of the

United Mine Workers of America ("the Union")[1] who were suspected of stealing

_____

[1]      We need not address plaintiffs' argument that the national union would be
responsible for the acts of its local affiliates, because, for purposes of this appeal, the Union has
conceded that.  Moreover, the issue is moot in light of our conclusion that the Union has no
liability.

goods from the Company. They appeal the grant of summary judgment to the Company and the Union concerning alleged violations of the Employee Polygraph Protection Act (EPPA). 29 U.S.C. §§ 2001-2009.[2] We affirm the judgment of the district court.

## I. BACKGROUND

Plaintiffs worked in the Company's coal mine in Shoal Creek, Alabama until they were discharged by the Company in 2002. Plaintiffs Watson and Owens were accused of stealing various items from the Company and plaintiffs Gaines, Johnson, and Tucker were accused of both selling controlled substances on the premises and paying another employee, Terry Clark, to steal items for them. The Company discharged the plaintiffs based on the statements of Clark, who earlier had been investigated by local police officers for thefts of Company property. In exchange for a reduced sentence, Clark agreed to cooperate with the Company's investigation. As a result of the Company's investigation, twenty-five employees, including eighteen union members, either resigned or were discharged.

Pursuant to the Union's agreement with the Company, the Company must have just cause for terminating the employment of union members. The procedure

---

[2]     Although plaintiffs also asserted other claims in the district court, they have not appealed the district court's decision with regard to those claims. Thus, claims other than the EPPA claims discussed in this opinion are deemed abandoned.

for discharging union employees takes four steps. At Step 1, the Company issues a notice of suspension with intent to discharge and the employee may challenge the discharge by speaking to his foreman. At Step 2, if the discharge is maintained, a Company representative and local union representatives meet to discuss the matter. At Step 3, if the matter is not resolved, then it is discussed by a Union district representative and a Company representative, neither of whom participated in earlier discussions about the discharge. Fourth and finally, if there is still disagreement about the discharge's propriety, the matter will be referred to an arbitrator. The arbitrator's decision is final.

The Union and the Company followed this procedure with the investigated union members. Two of the eighteen discharges were resolved in Step 1 or Step 2 meetings. The remaining discharges were discussed in a set of meetings taking place in the first week of April, 2002, prior to the official Step 3 meeting. At the first meeting, the Union offered to accept the Company's proposed drug policy in return for the reinstatement of the remaining sixteen employees. The Company then allowed the reinstatement of some employees but not the plaintiffs. The Union proposed that the plaintiffs, with the exception of Johnson, be given the option to take polygraph tests; if a plaintiff passed he would be reinstated with back pay and an apology. The Company agreed. At some point, the Company

4

also said that Terry Clark would also take a polygraph test. If he failed the test with respect to a particular plaintiff, that plaintiff would be reinstated with back pay and an apology.

On April 4, 2002, the plaintiffs had individual Step 3 meetings. Pursuant to the Union's proposal and the Company's agreement, Watson, Gaines, Owens and Tucker told that each could immediately be reinstated by taking a polygraph test or choose to have his case arbitrated. Each plaintiff opted for arbitration. On April 26, 2002, Terry Clark took a polygraph test which indicated that his statements against the plaintiffs were truthful.

All of the plaintiffs had their cases arbitrated except Tucker. His grievance was dropped by the Union for two reasons. First, the Union thought the evidence against him was too strong. Second, he did not respond to the Union representatives' requests for a meeting so that the Union could prepare for his arbitration. The arbitrations were held in June and July of 2002. The evidence against each plaintiff consisted of the testimony of Terry Clark and the testimony of the Company investigator. In addition, for all the remaining plaintiffs except Johnson, Clark's polygraph examiner testified as to Clark's truthfulness.

The arbitrators upheld the dismissals of all the remaining plaintiffs except Johnson. For each of the dismissed plaintiffs, the arbitrator based his decision both

on the testimony of Terry Clark and the results of Clark's polygraph test.[3]

In contrast to his fellow plaintiffs, Johnson prevailed before his arbitrator. He was ordered reinstated without back pay. During the arbitration, Johnson stated that he had not been given the opportunity to take a polygraph test. On cross-examination, the Company then offered him the chance to take a polygraph which he declined.

## II.  STANDARD OF REVIEW

In reviewing a district court's grant of summary judgment on claims arising under the EPPA, we review conclusions of law de novo and draw all factual inferences in favor of the non-moving party. Polkey v. Transtecs Corp., 404 F.3d 1264, 1267 (11th Cir. 2005).  We affirm a grant of summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

## III.  DISCUSSION

This case raises three questions.  First, did the Company engage in an activity described in 29 U.S.C. § 2002?  Second, if so, was its conduct nonetheless permitted under the "ongoing investigation" exemption of 29 U.S.C. § 2006(d)?

---

[3] We note that plaintiffs in this case have not challenged the Company's reliance on Clark's polygraph.

6

And finally, can the Union be sued as an "employer" for the purposes of the EPPA? Each is discussed in turn.

A.    Did the Company  Engage in an Activity Described in 29 U.S.C. § 2002?

As an employer that engages in interstate commerce, the Company must comply with the EPPA. 29 U.S.C. § 2002 (2005) (stating that the Act applies to employers "engaged in or affecting commerce or in the production of goods for commerce").   Plaintiffs contend that they have raised genuine issues of material fact concerning the Company's alleged violations of 29 U.S.C. §§ 2002(1), prohibiting employers from asking for lie detector tests,  and 2002(3)(A), prohibiting employers from punishing employees for failing to take lie detector tests.

1.    With respect to plaintiffs Watson, Gaines, Owens, and Tucker, the Company's conduct did not fall within 29 U.S.C. § 2002(1).

Under 29 U.S.C. § 2002(1), an employer may not "directly or indirectly . . . require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test."[4]  With respect to these four plaintiffs, the request or

_____

[4]    Although none of these plaintiffs ultimately took the polygraph exams, we have held that an employer's mere request is a violation.  See Polkey v. Transtecs Corp., 404 F.3d 1264, 1268 (11th Cir. 2004) ("the plain language [of § 2002(1)] prohibits an employer from requesting or suggesting that an employee submit to a polygraph exam even where the test is ultimately not administered and no adverse employment action is taken as a consequence."). Here, however, there was no "request or suggestion" by the Company.

suggestion that they take a polygraph test was made, not by the Company, but by the plaintiffs' own agent, the Union. Although the fact of such a request is a factual issue, in this case, there is no genuine issue of material fact with respect to the request, and by whom made. Plaintiffs, in their brief on appeal, concede that the Union proposed that the Company give a polygraph test to plaintiffs in order to get their jobs back. The record supports the concession. The tests were proposed by the Union as a means for the employees to prove their innocence. It is also clear that the tests were offered to Watson, Gaines, Owens, and Tucker pursuant to the Union's proposal. It was agreed that, if the results were favorable, plaintiffs would automatically be reinstated in their positions; otherwise, each case would be arbitrated. There is no evidence that the Company influenced the Union to request the polygraph exams. Under these circumstances, it is the Union, not the employer, who is deemed to have requested the polygraph exam for purposes of the statute.

We also conclude that there is no genuine issue of material fact with respect to the Union's agency status; it is clear that the Union was acting in the interest of, and for the benefit of, its members, including these four plaintiffs. We conclude that when the polygraph exam was offered to an employee pursuant to a request therefor by the employee or his or her agent in order to benefit the employee by

8

providing an opportunity to prove his or her innocence, then the employer has not violated § 2002(1).

2.    Johnson and 29. U.S.C. § 2002(1).

Because the factual issues surrounding the polygraph offer to Johnson are less clear than with respect to the other four plaintiffs, and because those issues are inadequately briefed, we decline to address them.  In light of our decision below with respect to the "ongoing investigation" exemption, those factual issues need not be resolved in this case.

3.    Did the Company's conduct fall within 29 U.S.C. § 2002(3)(A)?

For similar reasons, we decline to address plaintiffs' claim that the company's conduct fell within § 2002(3)(A), and instead turn directly to the Company's defense that its conduct is exempt pursuant to the "ongoing investigation" exemption.[5]

B.    Does the Company's Conduct Qualify for the "Ongoing Investigation" Exemption to the EPPA?

Even if the Company's conduct were an activity described in 29 U.S.C. § 2002, the EPPA permits such conduct if it is justified by one of the exemptions

_____

[5]    29 U.S.C. § 2002(3)(A) provides that employers may not "discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test."

listed in 29 U.S.C. § 2006.  The relevant exception for the purposes of this case is the ongoing investigation exemption.  29 U.S.C. § 2006(d).  This exemption permits employers to request a lie detector test if:

> (1)  the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;
> (2)  the employee had access to the property that is the subject of the investigation;
> (3)  the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation; and
> (4)  the employer executes a statement, provided to the examinee before the test [that describes with specificity the examinee's alleged misconduct].

Id.

Based on the eyewitness testimony of a former employee, the Company reasonably suspected the plaintiffs of stealing or having someone steal company property that was readily accessible to them.  Thus, the requirements of (2) and (3) have clearly been met, as has the "theft, embezzlement . . ." requirement of (1).

As for requirement (4), it is inapplicable in this context.  The requirement refers not to "employees" but "examinees," that is to say, individuals who will take the proposed tests.  See Polkey v. Transtecs Corp., 404 F.3d 1264, 1270 (11th Cir. 2005) (relying on the distinction between "employee" and examinee" to hold that the notice requirement applies only to individuals who will take lie detector tests).

Because plaintiffs declined to take lie detector tests, they were never "examinees" and so the Company was never obliged to provide them with statements of alleged misconduct.

The remaining issue is whether the Company's investigation could be considered "ongoing" by the time each plaintiff was asked to take a polygraph exam. The text of the statute itself provides no elaboration beyond the term "ongoing investigation." 29 U.S.C. § 2006(d). However, the most plausible construction of the statutory language would encompass the references in the instant case to the taking of a polygraph exam. There is ample evidence in the record demonstrating that the Company's decision with respect to each accused employee remained open throughout the grievance proceedings, as evidenced by the Company's acceptance of new information as to several employees and offering them reinstatement. With respect to each plaintiff, the reference occurred as part of the ongoing proceedings pursuant to the established procedures for determining employee culpability. As noted above, the agreement between the Company and the Union established a four-step procedure to determine an employee's culpability. Pending completion of the last step in the procedures, neither the culpability of the employee nor his employment status had been settled, as evidenced by the reinstatement of Johnson at the last step. Indeed, in this case the Union would not

11

permit the Company's investigator to interview or question plaintiffs with respect to the allegations, indicating that the matter could be handled through the established procedures. Under these circumstances, we hold that the Company's "ongoing investigation" and its final determination of the employment status of each plaintiff was not concluded until completion of the last step of the established procedures.

In conclusion, even if the Company's conduct were an activity described by § 2002, such conduct would be permitted under the "ongoing investigation" exemption.[6]

C.    <u>Does the Union Qualify as an "Employer" for the Purposes of the EPPA?</u>

Plaintiffs also argue that the Union's proposal that they take polygraph tests converted the Union into an "employer" for the purposes of the EPPA. We disagree.

The EPPA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee or prospective employee."

---

[6]    Plaintiffs' only challenge to the application of the "ongoing investigation" exemption in favor of the Company is their argument that the investigation was no longer "ongoing" by the time of the Company's relevant conduct with respect to the polygraph issues. In any event, the record is clear that there was ample "additional supporting evidence" as contemplated by § 2007(a).

29 U.S.C. § 2001(2). The question of whether and under what circumstances a union can qualify as an employer for purposes of the EPPA is one of first impression for this Circuit.

Indeed, we have found only one case that takes up this precise question. In del Canto v. I.T.T. Sheraton Corp., the District Court for the District of Columbia held that a union's status as an employer depends upon the level of control the union wielded over the putative employer as dictated by the economic realities of their relationship. 865 F.Supp. 927, 932-33 (D.D.C. 1994), aff'd sub nom. del Canto v. Richardson, 70 F.3d 637 (D.C. Cir. 1995) (unpublished). The economic reality test has also been the prevailing approach for courts determining whether a polygraph examiner is an "employer" for the purposes of the EPPA. See, e.g., Calbillo v. Cavender Oldsmobile, Inc., 288 F.3d 721, 726-28 (5th Cir. 2002); James v. Professionals' Detective Agency, Inc., 876 F.Supp. 1013,1015-16 (N.D. Ill. 1995); Fallin v. Mindis Metals, Inc., 865 F.Supp. 834, 839-40 (N.D. Ga. 1994); and Rubin v. Tourneau, Inc., 797 F.Supp. 247, 252-53 (S.D.N.Y. 1992).

This Circuit has also used the economic reality test in determining whether a party is an employer for the purposes of other federal employee protection statutes with definitions of "employer" similar to that of the EPPA. In Welch v. Laney, this Circuit had to determine whether the defendant was an employer for the

purposes of the Equal Pay Act, an extension of the Fair Labor Standards Act (FLSA), incorporating its definition of an employer: "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 57 F.3d 1004, 1011 (11th Cir. 1995) (quoting 29 U.S.C. § 203(d) (1978)). There, we considered "the total employment situation" and, in particular, "how much control did the alleged employer exert on the employees; and, did the alleged employer have the power to hire, fire, or modify the employment condition of the employees." Id. (internal citations and brackets omitted). In Wascura v. Carver, 169 F.3d 683, 686-87 (11th Cir. 1999), we applied the Welch test to the definition of "employer" found in the Family and Medical Leave Act (FMLA), which used the same definition as in the FLSA and the Equal Pay Act. Given the substantial similarity between the definitions of "employer" in the EPPA and in the FMLA and the FLSA, we find the economic reality test appropriate here as well.

Turning to the record, there is no evidence that the Union exerted enough control over the Company to be considered an "employer." Instead, the record indicates the contrary; the record indicates that the Union was acting in this case in the interests of its members, the plaintiffs, and not in the interest of the Company. The Union had originally requested that plaintiffs be reinstated in their jobs, and those requests were denied by the Company. Furthermore, the Union suggested

polygraph exams to give plaintiffs a quick way to clear their names and regain their jobs. The proposal was for the benefit of the plaintiffs, not the Company. There is no indication that the Union acted directly or indirectly in the interest of the Company in relation to the plaintiffs, so the Union cannot be considered an "employer" for the purposes of the EPPA. Thus, the plaintiffs' suit against the Union must fail.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**