**Opinion issued August 5, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00896-CV

———————————

**RACHAEL MENDOZA, Appellant**

**V.**

**LAZARO FRAZER, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-49867**

---

## MEMORANDUM OPINION

Appellant, Rachael Mendoza, challenges the trial court's issuance of a final protective order, entered after a hearing, against appellee, Lazaro Frazer, which included "[a]dditional [o]rders [r]egarding" Mendoza's minor child, G.F. In two issues, Mendoza contends that the trial court erred in granting more relief than

requested and it was without jurisdiction to make orders governing conservatorship, possession and access, and child support.

We modify the trial court's order and affirm as modified.

## Background

Mendoza, a resident of Harris County, Texas, filed an application for a protective order against Frazer, alleging that she and Frazer were the parents of G.F., members of the same household, and were previously in a dating relationship. According to Mendoza, Frazer had committed family violence against her by stalking.

Mendoza requested that the trial court issue a protective order and prohibit Frazer from, among other things, committing family violence, communicating with her and G.F. in a threatening or harassing manner, communicating a threat through another person to her and G.F., communicating with her or G.F. in any manner, going within 200 feet of her or her place of work, business, school, or residence, going within 200 feet of G.F.'s residence, child-care facility, or school, engaging in any conduct directed toward her and G.F., including stalking, that was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass them, and possessing a firearm. Mendoza also requested that the trial court make its orders in the best interest of G.F., prohibit Frazer from removing G.F. from her possession or from

2

any location, and prohibit Frazer from removing G.F. from the jurisdiction of the trial court. Mendoza requested attorney's fees and court costs.

Mendoza attached to her application her affidavit[1] in which she testified that in December 2022, she was "standing holding [G.F., who was an infant,] in the doorway to the [primary] bedroom" of her home when Frazer "picked up the TV in the [primary] bedroom and threw it on the floor to break it in anger." Frazer also "picked up a large glass bottle (5-gallon bottle) and threw it on the floor breaking it into" lots of pieces. Mendoza's other child, R.K., called Mendoza's stepfather to come to the house because she and Mendoza were both scared. Frazer then "ran into the [primary] bathroom and locked himself in" there. Mendoza's stepfather tried to talk to Frazer and get him to leave the home, but Frazer did not leave until it was time for him to go to work.

Mendoza further testified that there was "constant fighting" between her and Frazer every night. Frazer would "try to pick fights with" Mendoza and R.K. Mendoza also discovered that Frazer had firearms in the home, and he "started leaving them fully loaded lying around"; he would place firearms "out during or after an argument."

---

[1] A copy of Mendoza's affidavit was admitted into evidence at the hearing on Mendoza's application for a protective order.

According to Mendoza, on March 3, 2023, G.F. was injured. On that day, Frazer was asleep on the couch in the home when Mendoza woke him up and asked him "to cuddle with [G.F.] on the bed and watch her while [Mendoza] ran [a] short errand." When Mendoza returned home, G.F. was on the floor screaming, and Frazer was asleep on the couch. Frazer had left G.F. "on the bed" alone, and she had "tried to climb off the bed and fell and hit her head on the tile floor," while Frazer slept. After finding G.F., Mendoza called for emergency assistance, and emergency medical service personnel "came to check out" G.F., who was "more startled than hurt."

Additionally, on April 20, 2023, Frazer stopped by a hotel that Mendoza was "in an active lawsuit with and dropped off a yellow envelope" with a message stating that he would give the hotel's attorney information that would damage Mendoza's case. Frazer's actions showed that he was "trying to cause [Mendoza] harm."

Mendoza further testified that Frazer had been "driving by [her] house frequently." He would also "frequently go to the gas station around the corner from [her] house which was way out of his way from work or where he was staying hoping he would 'run into [her]' at the gas station." Although Mendoza had told Frazer "over and over and over again to stop texting [her]" or her parents, Frazer sent text messages to Mendoza "every other day asking for [her] to talk to him" and to try and see G.F. Mendoza ignored his text messages.

4

Mendoza feared Frazer, and she "d[id] not feel safe knowing that [he] was conspiring with [her] ex-husband specifically to try to cause [her] harm." She was afraid that Frazer would try to harm her or her daughter.

Frazer answered, generally denying the allegations in Mendoza's application.

At the hearing on her application for a protective order, Mendoza testified that she was seeking a protective order against Frazer. She met Frazer in February 2021, and they engaged in a dating relationship. Frazer lived with her from December 2021 until March 2023, and they had a child together, G.F.[2] At the time of the hearing, G.F. was eighteen months old. Mendoza had another child, R.K., who also lived in the same household.

While living together, Mendoza and Frazer argued every day, and their arguments were "[e]xtremely intense." According to Mendoza, Frazer owned at least three firearms that he kept in the home. Frazer would put the firearms in his nightstand in the primary bedroom or leave them around the house. When Mendoza and Frazer would argue, Frazer would bring the firearms out and put them on the table "right in front of [Mendoza] or right beside where he was at." Almost every

---

[2] Mendoza noted that while they lived together, Frazer had cameras installed in her home without her permission. Mendoza did not have access to the cameras placed by Frazer. They were "secret cameras." When Mendoza found them, she would take them down, but "another one would appear." She "found one in the bedroom after [she had] told [Frazer] he wasn't allowed to see [her] change clothes or be anywhere near [her] when [she] was undressed."

time that they argued, one of Frazer's firearms was in view. Mendoza noted that Frazer kept the firearms loaded, and during their arguments, Frazer would "look at the gun and then look back at [her]." When Mendoza saw Frazer's firearms, she felt terrified.

Mendoza also testified that Frazer had been physically abusive with her during their relationship. Violence occurred every day. In December 2022, Frazer told Mendoza that personnel at work were concerned about him being suicidal and homicidal.[3] At that time, Mendoza observed Frazer being "paranoid and irrational."

As to Frazer's violent acts, Mendoza explained that on one occasion, she was trying to leave the primary bedroom while holding G.F. when Frazer picked up "a 55-inch TV and threw it" to stop Mendoza from leaving. The television broke. When Mendoza became "adamant [that she] was going to get the baby out of the situation, [Frazer] grabbed a 5-gallon glass jar that had [coins] in it" and threw it. The glass jar shattered "inches away from where [G.F.] and [Mendoza] had just been standing." Mendoza reported that incident to law enforcement and took photographs

---

[3]     According to Mendoza, Frazer called her and told her that "he was coming home from work that night because he had two mental health officers show up and close the facility down to investigate whether he was suicidal or homicidal." Mendoza further stated that Frazer had threatened to commit suicide multiple times and tried to do so three or four times.

of the damage. Mendoza stated that she had felt terrified when Frazer had thrown the television.[4]

Mendoza further explained that Frazer followed her around the house and blocked her from leaving rooms. "He would reach his arm out trying to stop [her] from going [in] another direction unless [she] would let him touch [her]." This happened multiple times a day, and according to Mendoza, she was not free to move around the home. She felt "stuck" and "trapped." To get away from Frazer, Mendoza tried to lock the primary bedroom door, but Frazer used "some straight pin or something and g[o]t into the bedroom." Mendoza would find Frazer "standing over [her] while [she] was sleeping" around 3:00 or 4:00 a.m.

Mendoza testified about another instance in January or February 2023. At that time, Mendoza had locked herself in the primary bedroom so that she and G.F. could sleep, and Frazer went into the attic to "try[] to talk to [her] through the vent." Mendoza noted that she would also find Frazer sitting in the primary bedroom's closet eating snacks and watching her use the restroom and take a shower.[5]

---

[4] Mendoza noted that at the time of the television-incident she was already injured; her left acetabulum was "shattered." Mendoza was receiving disability payments because of her injury, and Frazer had reached out to her case manager multiple times "to let her know that [Mendoza was] not technically disabled in his opinion."

[5] Mendoza also stated that Frazer, in January 2023, while living with her, had shoved her other child, R.K., to the ground.

In March 2023, after Frazer was evicted from Mendoza's home, Mendoza saw him driving down "a street where he wasn't supposed to be" because "there was no reason for him to be on [her] side of town." She also saw him driving in her neighborhood or in her cul-de-sac. Mendoza told Frazer to "stop following" her, but he did not. She saw him at the grocery store and the gas station that she frequented as well as at the hairdresser, which was three-and-a-half hours away from where Frazer was purportedly living at the time. There was no reason for Frazer to be at such places because he had moved.

Mendoza also explained that before a temporary protective order was put in place by the trial court, she received text messages from Frazer multiple times every day. He sent lengthy text messages in the middle of the night, even though she had told him to stop. On June 13, 2023, Frazer sent her text messages at 12:45 a.m., 12:51 a.m., and 1:24 a.m., with one of them stating, "Yes I threatened to do this stuff to you . . . ." (Internal quotations omitted.)

As to harassment, Mendoza explained that before her relationship with Frazer, she had been married and her ex-husband was violent. After Frazer moved out of Mendoza's home, he reached out to her ex-husband and told him where she lived. Frazer also tried to become involved in a personal injury lawsuit that Mendoza had pending against a hotel. According to Mendoza, "[h]e went to the hotel and wrote a handwritten letter" that said he had information regarding the lawsuit and to contact

8

him. Frazer told her that he had done so "to make sure that [she] had no income to be able to take care of" G.F. and herself.

Further, Frazer reported Mendoza to Child Protective Services ("CPS") after he destroyed areas of their home. Frazer "stag[ed] big disasters" in the home. He put "dog feces in the living room right next to where [G.F.'s] play yard was."

Mendoza explained that she needed a protective order against Frazer because he "wo[uld not] stop." "He ha[d] nothing to lose," and "[h]e just want[ed] to make [her] life miserable." The temporary protective order put in place by the trial court had helped because Frazer had ceased contacting her, and she was "able to breathe a little bit." But she wanted to make sure that she and G.F. were okay.

Pattie Creel, Mendoza's mother, testified that she had witnessed Mendoza and Frazer argue. Those arguments consisted of "name calling and accusations." Before and after Frazer's eviction from Mendoza's home, their relationship was violent. After being evicted, Frazer was not welcome at the home, but he would show up. Twice Creel saw Frazer sitting in his car in the cul-de-sac watching the house for about ten or fifteen minutes. This made Mendoza afraid.

Creel also testified that she ran into Frazer at Mendoza's hairdresser, which was odd because he lived about fifteen or twenty miles away and "there[] [were] several hair places that he could go to instead of going to the one that [Mendoza went] to."

9

As to Mendoza's feelings toward Frazer, Creel described them as nervous and fearful. Creel believed that a protective order was necessary to protect Mendoza and G.F.

R.K., Mendoza's other child, testified that she was twenty-one years old and she lived with Mendoza and Frazer from January 2022 until February 2023. At first, Mendoza and Frazer's relationship was normal, but then, after a few months, it became toxic. During their arguments, Frazer would say that "he needed to get his firearm." Frazer "display[ed]" his firearms during arguments; "he would just have [them] handy with him." It made R.K. feel like she needed to be protective. She was afraid of Frazer.

R.K. also stated that on one occasion, she was trying to enter the home and unlocked the door. Frazer "opened the door fully and then pushed [her] to the floor and then locked it back." She believed that a protective order was necessary to protect Mendoza and G.F.

As to the television-incident, R.K. explained that she saw Frazer "throw the TV across the room toward [Mendoza] while she was holding [G.F.]" After, Frazer locked himself in the bathroom "for a period of time," and when he came out, he "threw the [five-gallon] glass jar on the floor."

Jonathan Parrella testified that he was currently in a dating relationship with Mendoza. He met Mendoza when Frazer was still living in her home, and she was

10

"trying to evict him from the premises because he refused to leave." Before the trial court entered its temporary protective order, Frazer tried to contact Mendoza "relentless[ly]." He tried to call her and sent her text messages. He also tried to communicate with her through her parents. He sent text messages constantly, and they were predominately sent in the middle of the night. Parrella described the messages as "books" because they were so long.

Parrella had heard Frazer say that he wanted to cause Mendoza "harm and pain and wanted to basically make her miserable." Frazer had caused Mendoza pain by trying to interfere in her lawsuit and "with her disability." Mendoza was afraid of Frazer. Parrella believed a protective order was necessary because Frazer would not stop harassing Mendoza.

Frazer testified that he began living with Mendoza around April 2021. According to Frazer, he kept firearms in the home in locked boxes in his closet.

Frazer denied that the television-incident had occurred,[6] and he stated that he had not dropped a glass jar on the floor. As to the television-incident, Frazer stated that he had been asleep for about two hours after working when Mendoza woke him up screaming at 9:00 a.m. Mendoza was upset about Frazer "let[ting] the dogs out." R.K. then hit him in the chest "out of the blue," while Frazer was arguing with

---

[6]     Frazer testified that the television had never been broken.

11

Mendoza.[7]  Frazer went into the bathroom to separate himself, and after being in the bathroom for a little while, he heard glass breaking.  When Frazer felt that it was safe, he came out of the bathroom and saw "broken glass and [coins] on the floor." He was the only one in the home, and he began cleaning up the glass and the coins.

Frazer also testified that he put cameras inside Mendoza's home in June 2022 with her knowledge.  He installed the cameras because he had never lived in a city, and it was for protection.  Frazer acknowledged that Mendoza took the cameras down and "hid" them, telling Frazer that it was an invasion of her privacy.  Frazer found one of the cameras that had been taken down and put it inside his closet.

As to G.F., Frazer testified that he had signed G.F.'s birth certificate and he acknowledged that he was her father.  Frazer further testified that there was a time that he was sleeping on the couch and G.F. fell off the bed.  Mendoza contacted her mother and told her mother that it was Frazer's fault that G.F. had fallen.  Mendoza also screamed at him.  After emergency medical service personnel arrived, they took G.F. to the ambulance to "check[] her out."

---

[7]    Frazer denied ever pushing R.K.

12

When Frazer was evicted from Mendoza's home, he called CPS because he was afraid for G.F.'s safety.[8] Frazer then moved in with his "oldest niece's mom." Frazer had sent text messages to Mendoza so that he could see G.F.

According to Frazer, the testimony in Mendoza's affidavit was false. Frazer also stated that he never ran into Mendoza or her mother at the hairdresser after he moved out; he lived three-and-a-half hours away.

Following the hearing, the trial court signed a final protective order, finding that Mendoza and Frazer were "previously involved in a dating relationship or members of the same family or household and [were] parents of the same child," there were "reasonable grounds to believe that [Mendoza was] the victim of stalking by [Frazer]," pursuant to Texas Code of Criminal Procedure chapter 7B, and there was "probable cause . . . to believe that an offense under" Texas Penal Code section 42.072 had been "committed and the nature of the scheme or course of conduct engaged in by [Frazer] in committing the offense indicate[d] [that Frazer was] likely in the future to engage in conduct prohibited by" Texas Penal Code section 42.072. The court also found that good cause existed to order "restrictive contact," the protective order was necessary "for the safety and welfare and in the best interest of [Mendoza]," and the protective order was necessary and appropriate "to prevent or

_____

[8] CPS thereafter required Frazer to participate in narcotics-use testing; he did not pass "due to [his] medications."

13

reduce the likelihood of future harm to [Mendoza] or a member of [her] family or household or family violence."

The trial court ordered that Frazer was prohibited from: (1) committing family violence against Mendoza; (2) communicating directly or indirectly with Mendoza in a threatening or harassing manner; (3) communicating a threat directly or through any person to Mendoza; (4) going to or near Mendoza's home, place of employment or business, or school, specifically within 200 feet; (5) engaging in conduct directed toward Mendoza, including following Mendoza, that was likely to harass, annoy, alarm, abuse, torment, or embarrass her; (6) harming, threatening, or interfering with the care, custody, or control of a pet, companion animal, or assistance animal possessed by Mendoza or a member of her family or household; (7) using a tracking application or device to track Mendoza without her effective consent; (8) physically following Mendoza or causing another to physically follow her; and (9) possessing a firearm within one mile of Mendoza or her home. The trial court made its protective order effective for six months.

The trial court also included in its protective order a section titled, "Additional Orders Regarding Child," which was related to G.F. In this portion of the order, the trial court found that it was in the best interest of G.F. that Mendoza and Frazer be named joint managing conservators of G.F., with Mendoza being granted the exclusive right to designate G.F.'s primary residence in Harris County. The trial

14

court also set out Mendoza and Frazer's "[r]ights and [d]uties" as to G.F. and made provisions related to "[t]ax [r]eturns for the [c]hild," and "[p]assport and [i]nternational [t]ravel." Further, the trial court made orders regarding possession of and access to G.F., child support, medical and dental support, and parental communication.

Mendoza filed a motion to modify the trial court's final protective order, requesting that the trial court set aside the "Additional Orders Regarding Child" portion of its order because the trial court lacked jurisdiction to issue orders relating to conservatorship, possession and access, and child support and the trial court's order did not conform to Mendoza's pleadings. Mendoza also filed a motion for new trial on the same grounds. The trial court denied Mendoza's motions.

## Standard of Review

Under Texas Rule of Civil Procedure 301, a trial court's judgment must conform to the pleadings. TEX. R. CIV. P. 301. Because a party's pleadings invoke the trial court's jurisdiction to render a judgment, an order not supported by the pleadings is void for lack of jurisdiction. *In re P.M.G.*, 405 S.W.3d 406, 416–17 (Tex. App.—Texarkana 2013, no pet.). Whether a trial court has jurisdiction to render an order is a question of law that we review de novo. *Gauci v. Gauci*, 471 S.W.3d 899, 901 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

15

**Relief Requested**

In her first issue, Mendoza argues that the trial court erred in including the "Additional Orders Regarding Child" section of its final protective order because Mendoza did not request orders relating to conservatorship, possession and access, and child support in her application for a protective order.

A trial court's judgment must be supported by the pleadings, and "a party may not be granted relief in the absence of pleadings to support that relief." *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983); *see also* TEX. R. CIV. P. 301. Unpled issues may be tried by consent; however, the doctrine of trial by consent "only applies when the record as a whole shows the unpled issue was tried." *In re M.G.N.*, 491 S.W.3d 386, 407 (Tex. App.—San Antonio 2016, pet. denied). "[A]n issue is not tried by consent if the evidence relevant to that issue is also relevant to other issues raised by the pleadings." *King v. Lyons*, 457 S.W.3d 122, 127 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

In her application, Mendoza requested that the trial court issue a protective order and prohibit Frazer from committing family violence, communicating with her and G.F. in a threatening or harassing manner, communicating a threat through another person to her and G.F., communicating with her or G.F. in any manner, going within 200 feet of her or her place of work, business, school, or residence, going within 200 feet of G.F.'s residence, child-care facility, or school, engaging in

any conduct directed toward her and G.F., including stalking, that was reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass them, and possessing a firearm. Mendoza also requested that the trial court make its protective order in the best interest of G.F., prohibit Frazer from removing G.F. from Mendoza's possession or from any location, and prohibit Frazer from removing G.F. from the jurisdiction of the trial court.

In its final protective order, the trial court, in a section titled, "Additional Orders Regarding Child," ordered that Mendoza and Frazer be named joint managing conservators of G.F., with Mendoza being granted the exclusive right to designate G.F.'s primary residence in Harris County. The trial court also set out Mendoza and Frazer's "[r]ights and [d]uties" as to G.F. and made provisions related to "[t]ax [r]eturns for the [c]hild" and "[p]assport and [i]nternational [t]ravel." Further, the trial court made orders regarding possession of and access to G.F., child support, medical and dental support, and parental communication. No pleadings on file requested such relief from the trial court.[9] *See, e.g.*, *Teel v. Shifflett*, 309 S.W.3d 597, 602 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (trial court's protective order improperly contained finding parties "were intimate partners under . . . federal statute" where application for protective order did not contain request for such

---

[9] No pleadings filed by Frazer in the trial court requested the additional relief ordered by the trial court.

17

finding); *Binder v. Joe*, 193 S.W.3d 29, 33 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (trial court erred in reducing parent's child-support arrearages and naming parent sole managing conservator when parent had not pled for such relief); *see also SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 354–55 (Tex. 1995) (petition must give fair and adequate notice of claims asserted).

In her briefing, Mendoza also asserts that the issues of conservatorship, possession and access, and child support related to G.F. were not tried by consent at the hearing on her application for a protective order.[10] We agree.

To determine whether an issue was tried by consent, the court must examine the record not for evidence of the issue, but rather for evidence of trial of the issue. *Bos v. Smith*, 556 S.W.3d 293, 306–07 (Tex. 2018). A party consents to trial of an unpled issue when evidence on the issue is developed under circumstances indicating that both parties understood what the issue was in the case, and they failed to make an appropriate complaint. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009) ("When both parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the defects are waived.").

Notably, "[t]rial by consent is a doctrine that is only intended to cover the exceptional case" where the record clearly reflects the parties' trial of an issue by

---

[10] Frazer did not file an appellee's brief in this case.

consent. *See Guillory v. Boykins*, 442 S.W.3d 682, 690 (Tex. App.—Houston [1st Dist.] 2014, no pet.). An issue is not tried by consent if the evidence presented on that issue is also relevant to other issues raised by the pleadings. *King*, 457 S.W.3d at 127. The trial-by-consent doctrine is "not intended to establish a general rule of practice," and it "should be applied with care." *Guillory*, 442 S.W.3d at 690. The doctrine should not be applied in a "doubtful situation." *RE/MAX of Tex., Inc. v. Katar Corp.*, 961 S.W.2d 324, 328 (Tex. App.—Houston [1st Dist.] 1997, pet. denied).

The issues addressed in the "Additional Orders Regarding Child" section of the trial court's final protective order were not tried by consent by the parties at the hearing on Mendoza's protective-order application. Instead, the entirety of the hearing was focused on Mendoza and Frazer's relationship, Mendoza's allegations of harassment, stalking, domestic violence, and threats, and the behaviors of the parties before and after Frazer was evicted from Mendoza's home.

Based on the foregoing, we hold that the trial court erred in including the "Additional Orders Regarding Child" section of its final protective order because it included relief not requested in the parties' pleadings and issues not tried by consent.

We sustain Mendoza's first issue.[11]

---

[11] Due to our disposition, we need not address Mendoza's second issue. *See* TEX. R. APP. P. 47.1.

19

## Conclusion

We modify the trial court's final protective order to delete the portion titled, "Additional Orders Regarding Child," which begins on page five and goes through the "Child Support Modification Notice" provision on page thirty-two. *See, e.g.*, *Teel*, 309 S.W.3d at 604 (modifying trial court's order to delete finding not requested in parties' pleadings); *see also* TEX. R. APP. P. 43.2(b). We affirm the trial court's order as modified.


Kristin Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.